GENE TANAKA, Bar No. 101423
gene.tanaka@bbklaw.com
(Counsel for service)
SHAWN D. HAGERTY, Bar No. 182435
shawn.hagerty@bbklaw.com
REBECCA ANDREWS, Bar No. 272967
rebecca.andrews@bbklaw.com
BEST BEST & KRIEGER LLP
2001 N. Main Street
Suite 390
Walnut Creek, California  94596
Telephone:      (925) 977-3300
Facsimile:      (925) 977-1870

Attorneys for Plaintiff
COUNTY OF AMADOR

Best Best & Krieger LLP
Attorneys at Law
2001 N. Main Street, Suite 390
Walnut Creek, California 94596

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

## ROBERT T. MATSUI FEDERAL COURTHOUSE

| | |
|---|---|
| COUNTY OF AMADOR, a public agency of the State of California, | Case No. |
| Plaintiff, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND BREACH OF CONTRACT** |
| v. | **Demand for Jury Trial** |
| KATHLEEN ALLISON in her official capacity as Secretary of the California Department of Corrections and Rehabilitation; PATRICK COVELLO in his official capacity of Warden of California Department of Corrections and Rehabilitation Mule Creek State Prison; and CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION | **(Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq.)** |
| Defendants. | Trial Date:      Not Set<br>Action Filed:   TBD |

## INTRODUCTION

1.      This is a civil enforcement action brought under the citizen suit provision of the Federal Water Pollution Control Act, also known as the Clean Water Act. 33 U.S.C. § 1251 *et seq.*

2.      This action arises out of the unlawful pollution of Mule Creek caused by discharges containing bacteria, pathogens, volatile organic compounds, heavy metals, and other "non-stormwater" by the California Department of Corrections and Rehabilitation ("CDCR"), Kathleen Allison, Secretary of CDCR and Defendant Patrick Covello, Warden of CDCR's Mule Creek State Prison (collectively "Defendants") from the Mule Creek State Prison facility ("Prison").

3.      Defendants' discharges from the Prison violate Section 301 of the Clean Water Act, 33 U.S.C. § 1311, which prohibits the discharge of pollutants to waters of the United States except as authorized, in part, by a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to section 402 of the Clean Water Act, 33 U.S.C. § 1342. Many of Defendants' discharges from the Prison covered by this action were made without any NPDES permit to authorize them.

4.      Defendants' discharges from the Prison also violate Section 402 of the Clean Water Act, 33 U.S.C. § 1342, which requires discharges from the Prison's storm drain system and areas of industrial activity to comply with the requirements of the State Water Resources Control Board's ("State Board") *National Pollutant Discharge Elimination System Permit for Waste Discharge Requirements for Storm Water Discharges from Small Municipal Separate Storm Sewer Systems*, Order 2013-0001-DWQ ("Small MS4 Permit") and the State Board's *General Permit for Storm Water Discharges Associated with Industrial Activities*, Order 2014-0057-DWQ, as amended, ("Industrial General Permit"). Many of Defendants' discharges from the Prison covered by this action were not in compliance with the requirements of any NPDES permit that Defendants belatedly obtained related to the discharges.

5.      Defendants' discharges from the Prison also constitute a breach of a 1985 agreement among CDCR, the County, the City of Ione and the Amador County Unified School

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND BREACH OF
CONTRACT

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CALIFORNIA, 94596

District ("1985 Agreement") that requires Defendants' wastewater collection and effluent treatment and disposal to be conducted in accordance with governing laws and regulations.

## **PARTIES**

6.      Plaintiff County of Amador is a public agency and legal subdivision of the State of California governed, in part, by Title 3 of the California Government Code ("Plaintiff" or "County").

7.      Defendant Kathleen Allison is the Secretary of CDCR and as such has responsibility for Defendants' compliance with all laws, regulations, and rules regarding the Prison's operation. Cal. Gov. Code § 12838.7. Defendant Secretary of CDCR is sued in her official capacity.

8.      Defendant Patrick Covello is the Warden of CDCR's Mule Creek State Prison and as such has responsibility for Defendants' compliance with all laws, regulations, and rules regarding CDCR's operations at the Prison. Cal. Penal Code § 5002(d). Defendant Warden of CDCR is sued in his official capacity.

9.      Defendant California Department of Corrections and Rehabilitation is an agency of the State of California established pursuant to California Government Code § 12838 to administer and operate California prisons.

10.      Plaintiff is ignorant of the true names and capacities of defendants sued herein as Does 1-5, inclusive, and therefore sues these defendants by such fictitious names. Plaintiff will amend this Complaint to allege their true names and capacities when these are ascertained. Plaintiff is informed and believes, and thereon alleges, that each of the fictitiously named defendants is responsible in some manner for the occurrences herein alleged, and that Plaintiff's injuries as herein alleged were proximately caused by the conduct of such fictitiously named defendants.

11.      Plaintiff is informed and on that basis alleges that, at all times stated in this pleading, each defendant was the agent, servant, or employee of each other defendant, and in doing the things alleged in this Complaint, was acting within the scope of said agency, servitude,

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CALIFORNIA 94596

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND BREACH OF CONTRACT

or employment and with the full knowledge or subsequent ratification of his principals, masters, and employers.

**JURISDICTION AND VENUE**

12.     This lawsuit is brought pursuant to the Clean Water Act, 33 U.S.C § 1251 *et seq.* This Court has subject matter jurisdiction over the claims for relief set forth herein pursuant to 33 U.S.C. § 1365(a) (citizen suits to enforce effluent standards or limitations under the Act), 28 U.S.C. § 1331 (actions arising under the laws of the United States), 28 U.S.C. §§ 2201-02 (power to issue declaratory judgments in cases of actual controversy), 33 U.S.C. § 1365(a) (injunctive relief). This Court has jurisdiction over the parties and the breach of contract claim because it is so related to the Clean Water Act claims that it forms part of the same case or controversy under Article III of the United States Constitution. 28 U.S.C. § 1367 (supplemental jurisdiction).

13.     The Prison is located at 4001 Highway 104, Ione, California, and the events giving rise to Plaintiff's action and the violations described in this Complaint occurred, and continue to occur, within this judicial district. See 33 U.S.C. § 1365(a)(1).

14.     On May 15, 2020, Plaintiff sent a letter by certified mail to Defendants. The letter notified Defendants of their violations of the Clean Water Act and of Plaintiff's intention to file suit for such violations after sixty (60) days, as required by 40 C.F.R. § 135.2(a)(1). A copy of the first notice letter is attached as **Exhibit A** to this Complaint and is incorporated herein by this reference. See 33 U.S.C. § 1365(b)(1)(A).

15.     On October 2, 2020, Plaintiff provided a second written notice of the violations set forth in this Complaint and of Plaintiff's intent to file suit on these Clean Water Act claims, to Defendants. A copy of the second notice letter is attached as **Exhibit B** to this Complaint and is incorporated herein by this reference. See 33 U.S.C. § 1365(b)(1)(A).

16.     Plaintiff sent the first and second notice letters (collectively "Notice") to the State Board, to the Central Valley Regional Water Quality Control Board ("Regional Board"), and to the Environmental Protection Agency ("EPA") Headquarters, Pacific Southwest Region 9, as identified on **Exhibits A and B**, as required by Section 505(b) of the Clean Water Act, 33 U.S.C. § 1365(b)(1)(A).

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CALIFORNIA, 94596

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND BREACH OF CONTRACT

17.     More than sixty (60) days has elapsed since service of Plaintiff's Notice, as required by the Clean Water Act. 33 U.S.C. § 1365(b)(1)(A).

18.     Plaintiff is informed and believes that neither the EPA nor the State or Regional Boards have commenced or is diligently prosecuting a civil or criminal action in a court of the United States or a State to require Defendants to address the violations alleged by Plaintiff in this Complaint. *Id. §* 1365(b)(1)(B).

19.     This action is not barred by any prior administrative penalty under Section 309(g) of the Clean Water Act, 33 U.S.C. § 1319(g).

20.     Venue properly lies in this judicial district under 28 U.S.C. § 1391(b)(1) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district, and under Clean Water Act section 505(c)(1), 33 U.S.C. § 1365(c)(1), because the sources of the violations at issue are located within this judicial district.

21.     Plaintiff seeks relief from Defendants' violations of the procedural and substantive requirements of Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

22.     Defendants have operated, and continue to operate, the Prison in violation of the Clean Water Act and in breach of the 1985 Agreement by: discharging pollutants to waters of the United States without an NPDES permit; discharging pollutants to waters of the United States in violation of the Small MS4 Permit; and discharging pollutants to waters of the United States in violation of the Industrial General Permit.

23.     Plaintiff has been and continues to be injured by Defendants' violations of the Clean Water Act and breach of the 1985 Agreement. Defendants' actions have impacted tourism and the County's tax base, which is affected by tourism. Plaintiff has incurred costs to investigate the source of pollution and to clean up areas affected by Defendants' illegal actions. Within its jurisdictional boundaries, Plaintiff provides storm water drainage and flood control services. Plaintiff's provision of storm water drainage and flood control services is governed, in part, by the Small MS4 Permit. Defendants' illegal discharges harm Plaintiff by interfering with Plaintiff's obligations under the Small MS4 Permit. As a direct and proximate result of Defendants' actions, Plaintiff has been damaged by the failure of Defendants to comply with laws

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CALIFORNIA 94596

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND BREACH OF
CONTRACT

1   governing the collection, treatment and disposal of wastewater as required by the 1985

2   Agreement. The relief sought herein will redress the harms to Plaintiff caused by Defendants'

3   activities.

4       24.     Plaintiff seeks declaratory and injunctive relief to end the unlawful acts and

5   omissions of Defendants that continue to cause irreparable damage to water quality. Plaintiff also

6   seeks recovery of reasonable costs of suit, including attorney, witness, expert, and consultant fees,

7   pursuant to Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d).

8                                   **LEGAL BACKGROUND**

9       **A.    Clean Water Act**

10      25.     In 1972, Congress enacted the Federal Water Pollution Control Act, known as the

11  Clean Water Act, in order to "restore and maintain the chemical, physical, and biological integrity

12  of the Nation's waters." 33 U.S.C. § 1251(a).

13      26.     Section 301(a) of the Clean Water Act prohibits the "discharge of any pollutant by

14  a person" without a permit issued under the Act. 33 U.S.C. § 1311(a).

15      27.     A "discharge of a pollutant" is the addition of any pollutant to navigable waters

16  from a point source. 33 U.S.C. § 1362(12).

17      28.     "Pollutant" is defined broadly to include "dredged spoil, solid waste, incinerator

18  residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials,

19  radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial,

20  municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6).

21      29.     A "point source" is "any discernible, confined and discrete conveyance, including

22  but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container . . . ."

23  33 U.S.C. § 1362(14).)

24      30.     A "discharge of a pollutant" occurs under the Clean Water Act when there is either

25  a discharge from a point source directly into navigable waters or when there is the functional

26  equivalent of a direct discharge. *County of Maui, Hawaii v. Hawaii Wildlife Fund* (2020) ___

27  U.S. ___, 140 S.Ct. 1462.

28

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CALIFORNIA 94596

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND BREACH OF
CONTRACT

31.     All direct discharges of pollutants from a point source and the functional equivalent of such direct discharges are illegal unless done in accordance with a permit issued under the Act. 33 U.S.C. § 1311(a). The Clean Water Act establishes the NPDES program to permit certain discharges of pollutants to navigable waters. 33 U.S.C § 1342.

32.     In California, the State Board and the nine Regional Water Quality Control Boards have been authorized by the EPA to issue permits under the NPDES program. Cal. Water Code §§ 13001, 13050(a)-(b), 13200.

33.     The Regional Board identified above is one of the nine regional boards. The Sacramento-San Joaquin Delta and the drainages from its watershed, including Mule Creek fall within the Regional Board's jurisdiction. Cal. Water Code § 13200(g).

34.     Discharges of pollutants to Mule Creek therefore require an NPDES permit issued by the State Board or the Regional Board. Discharges of pollutants to Mule Creek that occur without an NPDES permit, or in violation of an NPDES permit, are violations of the Act. 33 U.S.C. §§ 1311(a), 1342(a).

35.     Each violation of an NPDES permit – and each discharge of a pollutant that is not authorized by an NPDES permit – is a violation of the Clean Water Act and its implementing regulations and is grounds for enforcement actions, including citizen enforcement seeking declaratory and injunctive relief. 33 U.S.C. §§ 1311(a), 1342(a), 1365(a), 1365(f)(6); 40 C.F.R. § 122.41(a).

**B.     Small MS4 Permit**

36.     Municipal separate storm sewer systems ("MS4s") are point sources subject to NPDES permitting requirements under the Clean Water Act and its implementing regulations. See 33 U.S.C. §§ 1311(a), 1342(a), (p), 1362(12)(A); 40 C.F.R. §§ 122.2, 122.26(b)(8)(i)-(ii), (b)(18).

37.     Section B.1 of the Small MS4 Permit prohibits discharges from MS4s that are prohibited by the Basin Plan. Small MS4 Permit, Section B.1.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CALIFORNIA, 94596

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND BREACH OF CONTRACT

38.     Section B.2 of the Small MS4 Permit prohibits discharges from MS4s in a manner causing or threatening to cause a condition of pollution or nuisance. Small MS4 Permit, Section B.2; Cal. Water Code § 13050.

39.     Section B.4 of the Small MS4 Permit requires leaks from broken irrigation systems to be corrected within 72 hours of learning of the leak. Small MS4 Permit, Section B.4.

40.     Section C of the Small MS4 Permit imposes technology-based effluent limitations to reduce the discharge of pollutants from their MS4s to waters of the United States to the maximum extent practicable. Small MS4 Permit, Section C.

41.     Section D of the Small MS4 Permit prohibits, in part, discharges from the MS4 that cause or contribute to an exceedance of water quality standards contained in a Basin Plan and requiring implementation of additional best management practices to prevent or reduce any pollutants that are causing or contributing to the exceedance of water quality standards. Small MS4 Permit, Section D.

**C.     <u>Industrial General Permit</u>**

42.     The Industrial General Permit regulates industrial storm water discharges from specific categories of industrial facilities, which includes facilities with Standard Industrial Classification codes 20XX through 39XX, 4221 through 4225. Industrial General Permit, Attachment A, ¶ 2.

43.     Section XVII of the Industrial General Permit requires an industrial discharger seeking a conditional exemption from certain requirements of the Industrial General Permit to protect all industrial materials and activities from exposure to rain, snow, snowmelt, run-on, and runoff and to eliminate all unauthorized non-storm water discharges. Industrial General Permit, Provision XVII.C.

44.     Section III.C of the Industrial General Permit prohibits discharges that contain pollutants that cause or threaten to cause pollution, contamination, or nuisance as defined in Section 13050 of the Water Code. Industrial General Permit, Section III.C.

45.     Section III.D of the Industrial General Permit prohibits "discharges that violate any discharge prohibitions contained in applicable Regional Water Board Water Quality Control

Best Best & Krieger LLP
Attorneys at Law
2001 N. Main Street, Suite 390
Walnut Creek, California 94596

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND BREACH OF
CONTRACT

Plans (Basin Plans), or statewide water quality control plans." Industrial General Permit, Section III.D.

46.     Section VI of the Industrial General Permit prohibits discharges that cause or contribute to an exceedance of any applicable water quality standards, that adversely affect human health or the environment, and that contain pollutants in quantities that threaten to cause pollution or a public nuisance. Industrial General Permit, Sections VI.A, B, and C.

## FACTUAL BACKGROUND

### A.     The Prison Generally

47.     The Prison was constructed, in part, in accordance with the 1985 Agreement, which was amended one time in 1988. The agreement and amendment are referred to collectively as the "1985 Agreement." A copy of the1985 Agreement is attached to this Complaint as **Exhibit C.**

48.     Paragraph 2 of the 1985 Agreement permitted CDCR to construct a facility that was larger than the one it studied during environmental review under the California Environmental Quality Act, Cal. Pub. Res. Code § 21000 *et seq.*

49.     Pursuant to Paragraph 1 of the 1985 Agreement, CDCR agreed to operate the Prison in a manner consistent with specific hydrology and wastewater treatment mitigation measures, as well as laws and regulations governing wastewater and the disposal of treated effluent.

50.     The Prison opened in June of 1987, and at all relevant times, Defendants have owned and operated the Prison.

51.     Originally, the Prison accommodated approximately 2,800 inmates in three facilities and their accompanying yards (the "Old Prison").  In 2016, Defendants expanded the Old Prison by constructing the 1,584 inmate Mule Creek Infill Complex ("MCIC").

52.     Plaintiff is informed and believes that Defendants own and operate a storm drain system (an MS4), wastewater system, and industrial activities at the Prison.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CALIFORNIA 94596

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND BREACH OF CONTRACT

**B.** **Storm Drain System / MS4**

53.     The storm drain system at the Old Prison is a system of conveyances, including roads with drainage systems, curbs, gutters, ditches, channels, and storm drains and is used to convey storm water from the Old Prison facility, including from industrial areas, to Mule Creek.

54.     Plaintiff is informed and believes that approximately three-quarters of runoff from the Old Prison flows to the main outfall known as "GT-3" and approximately one-quarter of runoff form the Old Prison flows to a secondary outfall known as "GT-9". The stormwater collected from each outfall travels through culverts under an exterior perimeter road to earthen channels that flow to Mule  Creek.

55.     Prior to April 10, 2019, discharges from the Prison's storm drain system were not authorized by any Clean Water Act NPDES permit.

56.     Plaintiff is informed and believes that since approximately April 10, 2019, discharges from the Prison's storm drain system have been regulated under Small MS4 Permit.

57.     Surface flows from activities and locations within the larger Prison complex discharge directly to Mule Creek.

**C.** **Wastewater System**

58.     CDCR owns and operates a system to collect, convey, treat, and dispose of wastewater generated at the Prison.

59.     Wastewater generated at the Prison is a mixture of domestic and industrial wastewater.

60.     The Prison's wastewater collection system is regulated by State Board Order 2006-0003-DWR.

61.     Plaintiff is informed and believes that the Prison's wastewater collection has cracks and displaced joints, which allow raw sewage to exfiltrate from the collection system and enter the Prison's storm drain system.

62.     Analytical laboratory results of water samples within Mule Creek, from the Prison's storm drain system outfalls to Mule Creek, and within the storm drain system between 2017 and 2020, demonstrate more than 3,104 measured exceedances of the Clean Water Act's

Best Best & Krieger LLP
Attorneys at Law
2001 N. Main Street, Suite 390
Walnut Creek, California, 94596

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND BREACH OF CONTRACT

water quality objectives and constitute evidence of the faulty storm drain system and sewer system at the Prison.

63.     Treatment and disposal of the Prison's wastewater is regulated by Regional Board Order R5-2015-0129.

64.     Wastewater from the Prison is treated at a Prison-owned wastewater treatment plant consisting, in part, of two bar screenings, an oxidation ditch, two parallel clarifiers, an 84-inch chlorine contact pipe, a sludge belt press, sludge drying beds, an effluent storage reservoir, and land application areas ("LAAs").

65.     Treated effluent containing pollutants, including, in part, bacteria, nitrogen, chloride,  total dissolved solids, and VOCs, is stored in an effluent storage reservoir and is ultimately discharged to LAAs via spray irrigation.

66.     Mule Creek bisects the LAAs.

67.     When Defendants constructed the MCIC, it reduced the land available for the spraying of effluent from the wastewater treatment facility at the Prison. Plaintiff is informed and believes this reduction in land has resulted in the over spraying of the remaining land available.

**D.     Industrial Activities**

68.     Plaintiff is informed and believes that industrial activities occurring at the Prison include meat packing operations, laundry service, coffee roasting and packaging, and textiles manufacturing.

69.     Plaintiff is informed and believes that the industrial activities occurring at the Prison have Standard Industrial Classification code numbers 2399 (fabricated textile products, not elsewhere classified), 2095 (roasted coffee), 2011 (meat packing plants), and 2099 (food preparation, not elsewhere classified).

70.     Prior to May 22, 2018, discharges from the Prison's storm drain system were not authorized by the Industrial General Permit.

71.     Plaintiff is informed and believes that since May 22, 2018, discharges from the Prison's storm drain system have been regulated under the Industrial General Permit.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CALIFORNIA, 94596

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND BREACH OF
CONTRACT

72.     Plaintiff is informed and believes that before and after the Prison was enrolled under the Industrial General Permit, operations associated with these industrial activities, such as cardboard baling, cardboard storage, and trash storage, have been exposed to precipitation, which drains into the Prison's storm drain system.

73.     Plaintiff is informed and believes that Defendants have not prepared a stormwater pollution prevention plan, exceedance response action, or annual report in accordance with the Industrial General Permit.

**E.     Pollution Discharges from Prison**

74.     Since May 15, 2015 and continuing to the present, Defendants have been, and are continuing to, discharge pollutants into Mule Creek and ultimately the Sacramento-San Joaquin Delta.

75.     Based upon analytical laboratory data obtained from Defendants, Plaintiff is informed, believes, and thereon alleges that Defendants discharged pollutants from the Prison to Mule Creek, including but not limited to E. Coli, fecal coliforms, total dissolved solids, metals such as aluminum, copper, iron, lead, manganese, and zinc. These discharges include but are not limited to the following:

a.     On or about December 28, 2017, Defendants illegally discharged pollutants from a newly constructed storm water pipeline directly to Mule Creek. This discharge contained high levels of bacteria and other pollutants. This discharge was just one of a regular daily discharge observed between August 2017 and January 2018. These discharges included water that was described as at times being jet black, sometimes containing solids, and sometimes steaming hot.

b.     On or about March 22, 2018, Defendants intentionally discharged 1,600,000 gallons of comingled storm water and wastewater to Mule Creek. This discharge included pathogens, volatile and semivolatile organic compounds ("VOCs" and "SVOCs"), among other pollutants.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CALIFORNIA 94596

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND BREACH OF
CONTRACT

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CALIFORNIA, 94596

c.   On or about April 6, 2018, Defendants discharged 33,000 gallons of raw sewage to Mule Creek. This discharge included bacteria.

d.   On or about April 6 and 7, 2018, Defendants discharged 1,600,000 gallons of comingled storm water and wastewater to Mule Creek. This discharge included pathogens, VOCs and SVOCs, among other pollutants.

e.   On or about May 25, 2018, Defendants discharged 200,000 to 350,000 gallons of commingled storm water and wastewater to Mule Creek. This discharge included pathogens, VOCs and SVOCs, among other pollutants.

f.   On or about August 17, 2018, in a letter and report to the Regional Board, Defendants self-reported that it regularly conducted wash down activities over its storm drain facilities. These activities resulted in illegal discharges of industrial and other pollutants from the storm drains to Mule Creek.

g.   On or about July 13, 2019, Defendants spilled 5,000 gallons of effluent directly to Mule Creek. This discharge included pathogens in excess of water quality standards.

h.   On or about May 17, 2020, after Plaintiff sent the Notice, Defendants spilled 1.25 million gallons of commingled storm water and wastewater to Mule Creek. This discharge also demonstrates that the violations alleged in this Notice are ongoing and are likely to continue.

76.   In addition to these numerous and ongoing direct discharges, Defendants are also performing activities that result in the functional equivalent of direct discharges to Mule Creek. Plaintiff is informed and believes that over spraying on the LAAs has resulted in oversaturation of the land. This has caused seepage from the spray fields into Mule Creek. As is demonstrated in **Exhibit B**, exceedances of bacterial indicators in Mule Creek adjacent to the land application areas indicate significant discharges from the Prison's effluent disposal activities.

77.   Seepage from the LAAs is the functional equivalent of direct discharges to Mule Creek, and is prohibited without a permit under the Clean Water Act. Dischargers do not have a permit for these discharges. Despite not having a permit for these discharges, Defendants

1    continue to engage in this functional equivalent to a direct discharge. These activities are well

2    documented. For example, on July 25, 2019, Regional Board staff documented stagnant water in

3    Mule Creek downstream of the spray fields, even though the Creek was dry upstream and even

4    though then had been several months of hot, dry weather. These ongoing discharges result in the

5    regular discharge of pathogens, VOCs and SVOCs, among other pollutants, to Mule Creek in

6    violation of the Clean Water Act.

7          **F.**      **Environmental Resources and Threats to Water Quality**

8          78.    Mule Creek is tributary to Dry Creek, which runs to the Sacramento-San Joaquin

9    Delta. Mule Creek is a water of the United States.

10         79.    The Regional Board's Water Quality Control Plan for the Sacramento River and

11    San Joaquin River Basins ("Basin Plan") designates the following beneficial uses for the waters

12    of the Sacramento-San Joaquin Delta and its tributaries, including Mule Creek: municipal and

13    domestic supply; agricultural supply; industrial process and service supply; water contact

14    recreation; non-contact water recreation; warm freshwater habitat; cold freshwater habitat;

15    migration for aquatic organisms; spawning, reproduction, and/or early development; wildlife

16    habitat; and navigation. The beneficial uses of underlying groundwater are municipal and

17    domestic water supply, agricultural supply, and industrial service and process supply.

18         80.    The Basin Plan's narrative water quality objectives for chemical constituents, at a

19    minimum, require waters designated as domestic or municipal supply to meet the maximum

20    contaminant limits specified in Title 22 of the California Code of Regulations.

21         81.    The Basin Plan's water quality objective for fecal coliform bacteria in waters

22    designated for contact recreation provides that a minimum of not less than five samples for any

23    30-day period shall not exceed a geometric mean of 200/100 mL, and not more than ten percent

24    (10%) of the total number of samples taken during any 30-day period may exceed 400/100 mL.

25         82.    Water quality objectives for many of these designated beneficial uses have not

26    been attained in the Delta and many of its tributaries. For this reason, the Regional Board has

27    designated these water bodies as being "impaired" under Section 303(d) of the Clean Water Act

28

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CALIFORNIA 94596

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND BREACH OF
CONTRACT

for pollutants including, but not limited to, metals, nutrients, toxicity, and pesticides. 33 U.S.C. § 1313(d); see also Regional Board Resolution No. R5-2016-0083.

83.     The discharge of stormwater carrying pollutants from the Prison, including metals, pathogens, bacteria, volatile organic compounds, and other "non-stormwater" contributes to, threatens, and impairs Mule Creek and downstream receiving waters, including but not limited to the Sacramento-San Joaquin Delta.

84.     The discharge of sewage and polluted stormwater from the Prison is an ongoing problem, as further demonstrated by the Regional Board's issuance of investigation and violation notices on December 5, 2016, February 16, 2017, February 14, 2018, April 4, 2018, May 24, 2018, June 21, 2018, August 13, 2018, and September 23, 2020.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Unpermitted Discharges in Violation of Section 301(a) of the Clean Water Act 33 U.S.C. §§ 1311(a), 1365(a) and 1365(f)**

85.     Plaintiff incorporates and realleges the allegations contained in the above paragraphs as though fully set forth herein.

86.     Plaintiff is informed, believes, and thereon alleges, that on multiple occasions, Defendants and/or persons acting at their direction, or with Defendants' consent and/or knowledge, undertook wastewater disposal activities that resulted in the functional equivalent of direct discharges to Mule Creek.

87.     Upon information and belief, Plaintiff alleges that since at least May 15, 2015 Defendants have discharged, and continue to discharge pollutants from the Prison into waters of the United States without obtaining an NPDES permit in violation of Sections 301 and 402 of the Clean Water Act, 33 U.S.C. §§ 1311, 1342.

88.     Defendants' coverage under the MS4 Permit and Industrial General Permit do not authorize the discharge of sewage or of storm water contaminated by sewage.

89.     Defendants will continue to violate the Clean Water Act each day they discharge pollutants into Mule Creek without an NPDES permit.

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CALIFORNIA 94596

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND BREACH OF CONTRACT

90.     Each day that Defendants discharge pollutants without an NPDES permit is a separate and distinct violation of Section 301(a) of the Clean Water Act, 33 § U.S.C. 1311(a).

91.     An action for declaratory and injunctive relief under the Clean Water Act is authorized by 33 U.S.C. § 1365(a).

92.     Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and its members, for which Plaintiff has no plain, speedy, or adequate remedy at law.

**SECOND CAUSE OF ACTION**

**Discharges in Violation Of The Small MS4 Permit and Clean Water Act 33 U.S.C. §§ 1311(a), 1342(p), 1365(a) and 1365(f)**

104.     Plaintiff incorporates and realleges the allegations contained in the above paragraphs as though fully set forth herein.

105.     Plaintiff is informed, believes, and thereon alleges that the Prison owns and operates an MS4 that discharges into waters of the United States.

106.     Plaintiff is informed, believes, and thereon alleges that the Prison discharges pollutants associated with industrial activities from the MS4 into waters of the United States.

107.     Plaintiff is informed, believes, and thereon alleges that the Prison discharges pollutants associated with wastewater collection and treatment from the MS4 into waters of the United States.

108.     Plaintiff alleges that Defendants discharged pollutants from the Prison's MS4 between May 15, 2015 and April 10, 2019 to waters of the United States with impaired beneficial uses in violation of Section 301 of the Clean Water Act, 33 U.S.C. § 1311.

109.     Plaintiff alleges that Defendants' discharges of pollutants from the Prison's storm drain system after April 10, 2019 and continuing to the present were made in violation of Sections B.1, B.2 and B.4, "Discharge Prohibitions," C, "Effluent Limitations," and D, "Receiving Water Limitations,"  of the Small MS4 Permit and Sections 301 and 402 of the Act, 33 U.S.C. §§ 1311(a), 1342(a).

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CALIFORNIA 94596

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND BREACH OF CONTRACT

110.   Every day that the Prison discharges pollutants from its storm drain system is a separate and distinct violation of Sections 301 and 402 of the Clean Water Act, 33 U.S.C. §§ 1311, 1342.

111.   An action for declaratory and injunctive relief under the Clean Water Act is authorized by Section 505(a) of the Clean Water Act. 33 U.S.C. § 1365(a).

112.   Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff, for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

**THIRD CAUSE OF ACTION**

**Discharges in Violation of the Industrial General Permit and Clean Water Act 33 U.S.C. §§ 1311(a), 1342(p), 1365(a) and 1365(f)**

113.   Plaintiff incorporates and realleges the allegations contained in the above paragraphs as though fully set forth herein.

114.   Plaintiff is informed, believes, and thereon alleges that industrial activities occurring at the Prison are exposed to rain, snow, snow melt, run-on, or runoff.

115.   Plaintiff is informed, believes, and thereon alleges that the Prison discharges pollutants associated with industrial activities from the storm drain system into waters of the United States.

116.   Plaintiff alleges that Defendants discharged pollutants associated with the Prison's industrial activities between May 15, 2015 and May 22, 2018 without an NPDES permit to waters of the United States with impaired beneficial uses in violation of Section 301 of the Clean Water Act, 33 U.S.C. § 1311.

117.   Plaintiff alleges that Defendants' exposure of industrial activities to rain, snow, snow melt, run-on, and runoff after May 22, 2018 and continuing to the present were made in violation of Section XVII, "Conditional Exclusion – No Exposure Certification," of the Industrial General Permit and Sections 301 and 402 of the Clean Water Act, 33 U.S.C. §§ 1311, 1342.

118.   Plaintiff alleges that Defendants' discharges of pollutants associated with the Prison's industrial activities after May 22, 2018 and continuing to the present were made in

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CALIFORNIA, 94596

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND BREACH OF CONTRACT

1   violation of Sections III.C and D, "Discharge Prohibitions," of the Industrial General Permit and

2   Sections 301 and 402 of the Clean Water Act, 33 U.S.C. §§ 1311, 1342.

3       119.    Plaintiff alleges that Defendants' discharges of pollutants associated with the

4   Prison's industrial activities after May 22, 2018 and continuing to the present were made in

5   violation of Sections VI.A and B, "Receiving Water Limitations," of the Industrial General

6   Permit and Sections 301 and 402 of the Clean Water Act, 33 U.S.C. §§ 1311, 1342.

7       120.    Plaintiff alleges that every day that the Prison discharges pollutants from its storm

8   drain system is a separate and distinct violation of Sections 301 and 402 of the Clean Water Act,

9   33 U.S.C. §§ 1311, 1342.

10      121.    An action for declaratory and injunctive relief under the Clean Water Act is

11  authorized by Section 505(a). 33 U.S.C. § 1365(a).

12      122.    Continuing commission of the acts and omissions alleged above would irreparably

13  harm Plaintiff  for which harm Plaintiff has no plain, speedy, or adequate remedy at law.

**FOURTH CAUSE OF ACTION**

**Breach of Contract**

16      123.    Plaintiff incorporates and realleges the allegations contained in the above

17  paragraphs as though fully set forth herein.

18      124.    Plaintiff performed all terms, conditions, covenants, and promises required on its

19  part to be performed in accordance with the terms of the 1985 Agreement, except for any

20  covenants and conditions it was prevented or excused from performing.

21      125.    Defendants materially breached their obligations under the 1985 Agreement by

22  failing to perform their responsibilities and obligations, including, without limitation, operating

23  the wastewater collection system and treatment plant contrary to laws and regulations governing

24  wastewater and the disposal of treated effluent.

25      126.    As a direct and proximate result of the alleged breach of the 1985 Agreement,

26  Plaintiff has incurred actual and consequential damages in an amount to be determined at the time

27  of trial, and is entitled to payment for said damages with interest.

28

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CALIFORNIA, 94596

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND BREACH OF
CONTRACT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CALIFORNIA, 94596

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court:

1.      Enter a declaratory judgment that Defendants have violated and are violating Section 301 of the Clean Water Act, 33 U.S.C. § 1311 and Paragraph 1 of the 1985 Agreement, by discharging pollutants from storm drain system and spray fields into waters of the United States without an NPDES permit;

2.      Enter a declaratory judgment that Defendants violated Section 301 of the Clean Water Act, 33 U.S.C. § 1311 and Paragraph 1 of the 1985 Agreement, by discharging pollutants from its storm drain system into waters of the United States between May 15, 2015 and May 22, 2018 without coverage under the Industrial General Permit and between May 15, 2015 and April 10, 2019 without coverage under the Small MS4 Permit;

3.      Enter a declaratory judgment that Defendants have violated and are violating Sections 301 and 402 of the Clean Water Act, 33 U.S.C. §§ 1311 and 1342 and Paragraph 1 of the 1985 Agreement, by discharging pollutants from its storm drain system into waters of the United States in violation of the Small MS4 Permit;

4.      Enter a declaratory judgment that Defendants have violated and are violating Sections 301 and 402 of the Clean Water Act, 33 U.S.C. §§ 1311 and 1342 by discharging pollutants from storm drain system into waters of the United States in violation of the Industrial General Permit;

5.      Enter a declaratory judgment that Defendants have violated and are violating Sections 301 and 402 of the Clean Water Act, 33 U.S.C. §§ 1311 and 1342, by exposing industrial materials and activities to precipitation and discharging pollutants associated with industrial activities into waters of the United States without coverage under the Industrial General Permit.

6.      Issue appropriate injunctive relief enjoining Defendants from discharging or causing the discharge of pollutants directly or as the functional equivalent of a direct discharge from the Prison into any waters of the United States except in compliance with an NPDES permit;

7.      Award damages for breach of contract in an amount to be determined;

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND BREACH OF CONTRACT

1    8.      Enter a court order awarding Plaintiff its reasonable costs of suit, including

2   attorney, witness, expert, and consultant fees, as authorized by Section 505(d) of the Clean Water

3   Act, 33 U.S.C. § 1365(d);

4    9.      Make such additional judicial determinations and orders that are necessary to

5   effectuate the foregoing requests for relief;

6    10.     Retain continuing jurisdiction to review defendant's compliance with all

7   judgments entered herein;

8    11.     Issue any other relief as this Court may deem appropriate.

9

10   Dated: January 7, 2021                    BEST BEST & KRIEGER LLP

11

12                                            By: */s/ Gene Tanaka*
                                                  GENE TANAKA
13                                                SHAWN D. HAGERTY
                                                  GENE TANAKA
14                                                Attorneys for Plaintiff
                                                  COUNTY OF AMADOR

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CALIFORNIA, 94596

# **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: January 7, 2021                                    BEST BEST & KRIEGER LLP


By:  */s/ Gene Tanaka*
GENE TANAKA
SHAWN D. HAGERTY
REBECCA ANDREWS
Attorneys for Plaintiff
COUNTY OF AMADOR

BEST BEST & KRIEGER LLP
ATTORNEYS AT LAW
2001 N. MAIN STREET, SUITE 390
WALNUT CREEK, CALIFORNIA 94596

COMPLAINT FOR DECLARATORY AND
INJUNCTIVE RELIEF AND BREACH OF
CONTRACT

EXHIBIT A

**AMADOR COUNTY COUNSEL**
County Administration Center
810 Court Street, Jackson, CA 95642
Telephone (209) 223-6366 ♦FAX (209) 223-4286



**Via Certified Mail—Return Receipt Requested**

Gregory Gillott, County Counsel
Lesley Gomes, Deputy
Glenn Spitzer, Deputy
Angela Creach, Paralegal

May 15, 2020

Patrick Covello, Warden
California Department of Corrections
Mule Creek State Prison
P.O. Box 409099
Ione, CA 95640

Ralph Diaz, Secretary
California Department of Corrections and Rehabilitation
1515 South Street, #101n
Sacramento, CA 95811

RE:   **Notice of Violations and Intent to Sue Under the Federal Water
Pollution Control Act (Clean Water Act)**

Dear Warden Covello and Secretary Diaz:

This Notice of Violations and Intent to Sue ("Notice") is provided on behalf of the County of Amador ("County") with regard to violations of the Federal Water Pollution Control Act, commonly known as the Clean Water Act ("CWA" or "Act"; 33 U.S.C. § 1251 *et seq.*). The County alleges that the California Department of Corrections and Rehabilitation ("CDCR") is engaging in ongoing violations of the CWA by discharging pollutants from Mule Creek State Prison ("Prison") to Mule Creek, a water of the United States, without a permit as required by the CWA or, in the alternative, in violation of any applicable permit(s) related to such discharges. The County hereby gives CDCR notice of its intent to sue CDCR for these ongoing violations of the CWA starting sixty (60) days after this Notice, unless CDCR enters into a binding agreement with the County to cease all illegal discharges and to fully and promptly remediate the impacts of all past, current and imminent violations.

## I.
## Factual Background

Mule Creek State Prison opened in June of 1987, and is owned and operated by CDCR. Originally, the Prison accommodated approximately 2,800 inmates in three facilities and their accompanying yards (the "Old Prison"). In 2016, CDCR expanded the Old Prison by constructing the 1,584 inmate Mule Creek Infill Complex ("MCIC"). The construction of MCIC

Patrick Covello, Warden
California Department of Corrections
Ralph Diaz, Secretary
California Department of Corrections and Rehabilitation
May 15, 2020
Page 2

reduced land available for the spraying of treated effluent from the wastewater treatment facility on the site.

The Old Prison was constructed in part in accordance with a 1985 agreement among CDCR, the County, the City of Ione and the Amador County Unified School District. This agreement permitted CDCR to construct a facility that was larger than the one it had studied in the environmental document it had prepared under the California Environmental Quality Act ("CEQA"). As part of this agreement, CDCR agreed to operate the facility in a manner consistent with specific hydrology and wastewater treatment mitigation measures, as well as laws and regulations governing wastewater and the disposal of treated effluent. As documented in this Notice, CDCR is not operating the facility as required by these measures or in accordance with the laws and regulations governing wastewater and treated effluent, and is thus in violation of the 1985 agreement.

During the last five (5) years, and on an ongoing basis, there have been numerous documented discharges of pollutants from the Prison to Mule Creek. For example, on December 28, 2017, discharges of water described to be at times jet black, sometimes containing solids, and sometimes steaming hot, were discharged to Mule Creek from a pipeline that originated at the Prison. This discharge originated from a storm water collection and conveyance system that surrounds the Old Prison. Samples of the water from this system revealed that the discharge contained wastewater comingled with contaminated storm water and grey water. The discharge contained very high levels of Total Coliform, E. Coli and Fecal Coliform.

Similarly, on multiple occasions in 2018, CDCR intentionally discharged millions of gallons of comingled storm water and wastewater to Mule Creek from the Prison. These discharges contained bacteria and industrial pollutants that are illegal to discharge to Mule Creek without a permit or in violation of the requirements of any applicable permit.

In addition to such ongoing discharges from the various pipes and collection systems at the Prison, there have been documented spills of wastewater to Mule Creek. For example, in July of 2019, a documented spill of wastewater to Mule Creek occurred. Similarly, in April of 2018, thirty-three thousand (33,000) gallons of raw sewage was discharged to Mule Creek.

Discharges from the Prison to Mule Creek also occur when pollutants from the wastewater system at the Prison are discharged to spray fields that load directly to Mule Creek. For example, on July 25, 2019, Mule Creek downstream of the Prison was full of stagnant water, even though there had been several months of hot, dry weather and even though Mule Creek was dry upstream of the Prison. This condition was a direct result of heavy hydraulic loading from oversaturated wastewater spraying fields, which resulted in either a direct discharge of pollutants to Mule Creek or the effective equivalent of a direct discharge.

Patrick Covello, Warden
California Department of Corrections
Ralph Diaz, Secretary
California Department of Corrections and Rehabilitation
May 15, 2020
Page 3

Despite causing these direct discharges of pollutants to Mule Creek, or the effective equivalent of such direct discharges, CDCR does not have a National Pollutant Discharge Elimination System ("NPDES") permit that authorizes such discharges or their effective equivalent. The CDCR operates the wastewater system at the Prison under Waste Discharge Requirements ("WDR") Order R5-2015-0129, issued by the Central Valley Regional Water Quality Control Board ("Regional Board"). However, the WDR is a permit issued under California law, and does not cover discharges of pollutants to Mule Creek. In addition, the Regional Board has determined that the WDR does not authorize the discharges described in this Notice. Therefore, the discharges of pollutants to Mule Creek from the Prison are illegal discharges made in violation of the Act.

In addition, CDCR has not timely sought to obtain coverage under general NPDES permits[1] that are required for some of the discharges and activities alleged in this Notice, or has not complied with the requirements of these general NPDES permits for any of the limited periods of time during which it has enrolled under them. Each of the general NPDES permits contains discharge prohibitions, effluent limitations and receiving water limitations that prohibit discharges of pollutants that exceed water quality standards, create conditions of nuisance or cause a condition of pollution, among other requirements. None of these permits allow CDCR to discharge raw waste, comingled wastewater and storm water, industrial pollutants, including, but not limited to designated wastes such as volatile organic chemicals ("VOCs") and semi-volatile compounds ("SVOCs"). Any discharges that occurred during any period when CDCR had coverage under any of the three general NPDES permits were made in violation of the discharge prohibitions, effluent limitations and the receiving water limitations of those permits, and were thus illegal discharges. Therefore, CDCR does not maintain NPDES permits that would permit

---

[1] Coverage under at least three general NPDES permits issued by the State Water Resources Control Board is required for at least some of the activities at the Prison. First, the industrial activities at the Prison require coverage under the General Permit for Storm Water Discharges Associated with Industrial Activities, Order 2014-0057-DWQ, as amended ("Industrial Permit"). CDCR either did not have coverage under the Industrial Permit for the discharges alleged in this Notice or did not comply with the conditions of the Industrial Permit related to the discharges. Second, the construction activities at the Prison require coverage under the General Permit for Storm Water Discharges Associated with Construction and Land Disturbance Activities, Order 2009-0009-DWQ, as amended ("Construction Permit"). CDCR either did not have coverage under the Construction Permit for the discharges alleged in this Notice or did not comply with the conditions of the Construction Permit related to the discharges. Third, operations of the storm water conveyance system at the Prison may in part require coverage under the National Pollutant Discharge Elimination System Permit for Waste Discharge Requirements for Storm Water Discharges from Small Municipal Separate Storm Sewer Systems, Order 2013-0001-DWQ ("Small MS4 Permit"). In or about February of 2019, after most of the discharges alleged in this Notice occurred, the Regional Board required CDCR to obtain coverage under the Small MS4 Permit, and CDCR may have subsequently obtained such coverage in or about April of 2019. CDCR did not have coverage under the Small MS4 Permit for most of the discharges alleged in this Notice, and the discharges that have occurred after it sought coverage are not permitted by the Small MS4 Permit.

80237.00844\32940778.4

Patrick Covello, Warden
California Department of Corrections
Ralph Diaz, Secretary
California Department of Corrections and Rehabilitation
May 15, 2020
Page 4

these discharges to Mule Creek, and CDCR is, has been, and will remain in violation of the CWA.

The County has repeatedly attempted to work with CDCR to eliminate these discharges to Mule Creek. Similarly, the County has encouraged the Regional Board to diligently prosecute CDCR for these multiple violations of the CWA as alleged in this Notice. As of today, CDCR has not eliminated these discharges to Mule Creek and the Regional Board has not commenced nor diligently prosecuted CDCR for the repeated and ongoing violations of the CWA. Therefore, the County has no choice but to provide this Notice, and, unless CDCR enters into a binding agreement to cease and desist the discharges, and remediate the pollution they have created, the County will have no choice but to sue CDCR over these ongoing violations.

## II.
## Clean Water Act Requirements

The CWA prohibits the "discharge of any pollutant by a person" without a permit issued under the Act. (33 U.S.C. § 1311(a).) The CWA defines a "discharge of a pollutant" as the addition of any pollutant to navigable waters from a point source. (33 U.S.C. § 1362(12).) The Act further defines a point source as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container . . . ." (33 U.S.C. § 1362(14).) The United States Supreme Court has recently clarified that a "discharge of a pollutant" occurs under the Act when there is either a discharge from a point source directly into navigable waters or when there is the functional equivalent of a direct discharge. (*County of Maui, Hawaii v. Hawaii Wildlife Fund* 590 U.S. ___ (2020).)

All direct discharges of pollutants from a point source or the functional equivalent of such direct discharges are illegal unless done in accordance with a permit issued under the Act. As relevant here, the CWA establishes the NPDES program to permit certain discharges of pollutants to navigable waters. (33 U.S.C § 1342.) In California, the State Water Resources Control Board ("State Board") and the nine Regional Water Quality Control Boards, including the Regional Board, have been authorized by the Environmental Protection Agency ("EPA") to issue permits under the NPDES program. Discharges of pollutants to Mule Creek therefore require an NPDES permit issued by the State Board or the Regional Board. Discharges of pollutants to Mule Creek that occur without an NPDES permit, or in violation of an NPDES permit, are violations of the Act. (33 U.S.C. § 1311 (a).)

The CWA provides that enforcement of the Act may be commenced by persons acting under the citizen suit provisions of the statute. (33 U.S.C § 1365.) The County is exercising its rights under these provisions of the Act to enforce compliance by CDCR with the CWA, and to stop these ongoing illegal discharges to Mule Creek.

Patrick Covello, Warden
California Department of Corrections
Ralph Diaz, Secretary
California Department of Corrections and Rehabilitation
May 15, 2020
Page 5

### III.
### Notice Requirements

The Act and its implementing regulations (see 40 CFR 135.2 and 135.3) provide that a 60-day notice should include sufficient information to permit the recipient to identify the standard, limitation or order alleged to be violated, the activity alleged to constitute the violation, the person or persons responsibility for the alleged violation, the location of the alleged violation, the date or dates of the alleged violation and the identity of the person giving notice.   That information is set forth below.

**A.     The Specified Standard, Limitation, or Order Alleged to Have Been Violated**

The County has identified numerous discharges of pollutants from the Prison to Mule Creek without an NPDES permit in violation of the CWA.  (33 U.S.C § 1311(a).)  These discharges without a permit violate the CWA, which provides that: "Except as in compliance with this section and sections 302, 306, 307, 318, 402, 404 of this Act, the discharge of any pollutant by any person shall be unlawful."  The discharges of pollutants from the Prison to Mule Creek are unlawful under 33 U.S.C. section 1311(a) because CDCR does not have an NPDES or other federal permit that allows those discharges to occur.

In the alternative, the discharges alleged in this Notice are unlawful under 33 U.S.C. section 1311(a) because the discharges are not in compliance with the requirements of any applicable NPDES permit CDCR does maintain.  CDCR has not timely obtained coverage under the Small MS4 Permit, the Industrial Permit or the Construction Permit related to the activities resulting in these discharges.  To the extent CDCR has belatedly obtained, or sought to obtain, such coverage, these discharges violate the discharge prohibitions, effluent limitations and receiving water limitations contained in these NPDES permits.  For example, the Small MS4 Permit prohibits the discharge of non-storm water (including wastewater), prohibits discharges that cause or threaten conditions of pollution or nuisance, requires compliance with effluent limitations that among other things prohibits discharges of hazardous substances and prohibits discharges that "cause or contribute to an exceedance of water quality standards . . . ."  (See Small MS4 Permit, Sections B (Discharge Prohibitions), C (Effluent Limitations) and D (Receiving Water Limitations).)   The Industrial Permit and the Construction Permit contain similar discharge prohibitions, effluent limitations and receiving water limitations.   (See Industrial Permit, Sections III (Discharge Prohibitions), V (Effluent Limitations) and VI (Receiving Water Limitations); *Baykeeper v. Kramer Metals, Inc.* (C.D. Cal. 2009) 619 F.Supp.2d 914, 926); Construction Permit, Sections III (Discharge Prohibitions), V (Effluent Limitations) and VI (Receiving Water Limitations).)   Because the discharges alleged in this Notice violate the discharge prohibitions, effluent limitations and receiving water limitations of these permits, they are illegal discharges under the Act.

Patrick Covello, Warden
California Department of Corrections
Ralph Diaz, Secretary
California Department of Corrections and Rehabilitation
May 15, 2020
Page 6

**B.      The Activity Alleged to Constitute a Violation**

The County contends that from May 15, 2015 to May 15, 2020, CDCR has violated the Act as described in this Notice. The County contends these violations are continuing or have the likelihood of occurring in the future.

1.      <u>Direct Discharges to Mule Creek</u>.  The County has documented multiple and ongoing direct discharges of pollutants to Mule Creek.  In some cases, the discharges involve millions of gallons of polluted water.  Representative examples of CDCR activities alleged to violate 33 U.S.C section 1311(a) include:

a.      <u>December 28, 2017</u>.  On December 28, 2017, CDCR illegally discharged pollutants from a newly constructed storm water pipeline directly to Mule Creek.  This discharge contained high levels of bacteria and other pollutants that violate water quality standards.  This discharge was just one of a regular daily discharge observed between August 2017 and January 2018.  These discharges included water that was described as at times being jet black, sometimes containing solids, and sometimes steaming hot.

b.      <u>March 22 and 23, 2018</u>.  On March 22, 2018, CDCR intentionally discharged 1,250,000 gallons of comingled storm water and wastewater to Mule Creek.  The details of this discharge are set forth in OES Report 18-1892.  On March 23, 2018, CDCR updated OES Report 18-1892 to report a total discharge of 1,600,000 gallons to Mule Creek.  This discharge included pathogens, VOCs and SVOCs, among other pollutants that violate water quality standards.

c.      <u>April 6, 2018</u>.  On April 6, 2018, CDCR discharged 33,000 gallons of raw sewage to Mule Creek.  The details of this discharge of raw sewage are set forth in OES Report 18-2255.  This discharge included pathogens that violate water quality standards.

d.      <u>April 6-7, 2018</u>.  On April 6 and 7, 2018, CDCR discharged 1,600,000 gallons of comingled storm water and wastewater to Mule Creek.  The details of this discharge are set forth in OES Report 18-2307.  This discharge included pathogens, VOCs and SVOCs, among other pollutants that violate water quality standards.

e.      <u>May 25, 2018</u>.  On May 25, 2018, CDCR discharged 200,000 to 350,000 gallons of commingled storm water and wastewater to Mule Creek.  The details of this discharge are set forth in OES Report 18-3383.  This discharge included pathogens, VOCs and SVOCs, among other pollutants that violate water quality standards.

f.      <u>August 17, 2018</u>.  On August 17, 2018, in a letter and report to the Regional Board, CDCR self-reported that it regularly conducts wash down activities over its

Patrick Covello, Warden
California Department of Corrections
Ralph Diaz, Secretary
California Department of Corrections and Rehabilitation
May 15, 2020
Page 7

storm drain facilities. These activities resulted in illegal discharges of industrial and other pollutants from the storm drains to Mule Creek.

       g.    <u>July 13, 2019</u>. On July 13, 2019, CDCR spilled 5,000 gallons of effluent directly to Mule Creek. This discharge included pathogens in excess of water quality standards.

       2.    <u>Functional Equivalent of Direct Discharges to Mule Creek</u>. In addition to these numerous and ongoing direct discharges, CDCR is also performing activities that have resulted in the functional equivalent of direct discharges to Mule Creek. When the CDCR constructed the MCIC, it reduced the land available for the spraying of effluent from the wastewater treatment facility at the Prison. This reduction in land has resulted in the over spraying of the remaining land available. This over spraying has resulted in over saturation of the remaining spray fields. This has caused seepage from the spray fields into Mule Creek.

       This seepage is the functional equivalent of ongoing direct discharges to Mule Creek, and is prohibited without an NPDES permit. None of the three general NPDES permits would permit this discharge of wastewater effluent to Mule Creek, and any state permit issued by the Regional Board under state law would not be sufficient to permit these discharges under the Act . Despite not having a permit for these discharges, CDCR continues to engage in this functional equivalent to a direct discharge. These activities are well documented. For example, on July 25, 2019, Regional Board staff documented stagnant water in Mule Creek downstream of the spray fields, even though the Creek was dry upstream and even though then had been several months of hot, dry weather. These ongoing discharges result in the regular discharge of pathogens, VOCs and SVOCs, among other pollutants, to Mule Creek in violation of the Act.

**C.**    **The Person or Persons Responsible for the Alleged Violation**

       The entity responsible for the alleged violation identified in this Notice is the CDCR and those of its employees or agents responsible for compliance with the CWA and with any applicable state and federal regulations and permits. CDCR owns and operates the Prison, its wastewater facility, its conveyance systems and other infrastructure that results in the discharges alleged in this Notice. The treatment system at the facility also treats wastewater generated from the Preston Youth Correctional Facility and the California Department of Forestry Fire Training Academy, in addition to the Prison's wastewater, but the violations alleged in this Notice are the sole result of the activities, inactions and facilities of CDCR.

**D.**    **The Location of the Alleged Violation**

       The location of the alleged violations is the portion of Mule Creek adjacent to the Prison that has received the pollutants from the direct and indirect discharges referred to in this Notice.

Patrick Covello, Warden
California Department of Corrections
Ralph Diaz, Secretary
California Department of Corrections and Rehabilitation
May 15, 2020
Page 8

The specific location for each alleged discharge is set forth in the reports referred to in this Notice, in records created and/or maintained by CDCR, as well as in reports and records created and/or maintained by the Regional Board.  The Prison is located at 4001 on Highway 104 in the City of Ione in Amador County, and the discharges alleged in this Notice all originated at the Prison and were conveyed to the adjacent Mule Creek.

**E.      The Date or Dates of Violations or a Reasonable Range of Dates During Which the Alleged Activity Occurred**

The range of dates covered by this Notice is May 15, 2015 to May 15, 2020.  The County may from time to time update this Notice to include additional violations of the CWA by the CDCR which occur during or after the range of dates currently covered.  Some violations are continuous, and therefore each day constitutes a violation.  As described in this Notice, and by way of illustration only, specific violations highlighted in this Notice occurred on December 28, 2017, March 22, 2018, March 23, 2018, April 7, 2018, May 25, 2018, August 17, 2018, July 13, 2019 and July 25, 2019.

**F.      The Full Name, Address and Telephone Number of the Person Giving Notice**

The entity giving this Notice is the County of Amador, a municipal corporation.  The County's mailing address is 810 Court Street, Jackson, California, 95642, and its telephone number is (209) 223-6470.  This Notice is being provided by the County Counsel for the County of Amador at the direction of the Board of Supervisors of the County.   Please direct all correspondence regarding this Notice to Gregory Gillott, Amador County Counsel, 810 Court Street, Jackson, CA, 95642, (209) 223-6366, ggillot@amadorgov.org.

The County and the residents of the County have sustained, and continue to sustain, direct injuries due to CDCR's violations of the CWA that are subject to redress through litigation under the Act.  The discharges alleged in this Notice have caused the County to incur substantial costs associated with the pollutants discharged to Mule Creek and the pollution of the groundwater basin.  The pollution has also deteriorated the quality of the Mule Creek area, resulting in lost recreational and other opportunities that in turn have resulted in a fiscal impacts to the County through lost sales and other taxes.  Similarly, the pollution has also impacted the residents of the County, including by depriving them of recreational opportunities and also resulting in pollution of private and public wells and land in the area.  The County provides this Notice and will pursue litigation if necessary to redress these direct injuries that are caused by CDCR's violations of the CWA.

Patrick Covello, Warden
California Department of Corrections
Ralph Diaz, Secretary
California Department of Corrections and Rehabilitation
May 15, 2020
Page 9

## IV.
## Cease and Desist Demand and Remedial Measures

During the 60-day notice period, the County stands ready to meet with CDCR to discuss a possible resolution of the issues presented in this Notice. If a reasonable written settlement can be reached during the 60-day notice period, the County would be willing to consider foregoing this litigation. However, a reasonable settlement would need to include:

- An immediate commitment to cease and desist all unpermitted discharges;

- An agreement to comply with all discharge prohibitions, effluent limitations and receiving water limitations of the Small MS4 Permit, the Industrial Permit and the Construction Permit, as applicable, to the extent CDCR has obtained coverage under any of these permits.

- An agreement to timely obtain all additional NPDES permits required, in addition to the renewal or expansion of state permits related to the wastewater system to include provisions sufficient to treat the industrial pollutants from the facility and to end the indirect discharges from the spray fields to Mule Creek;

- An agreement to remediate the pollution to Mule Creek and to the associated groundwater basin, including impacts to public and private lands and wells;

- Reasonable compensation for the County's costs and fees.

Patrick Covello, Warden
California Department of Corrections
Ralph Diaz, Secretary
California Department of Corrections and Rehabilitation
May 15, 2020
Page 10

## V.
## Conclusion

Please contact County Counsel Gregory Gillott if you are willing to engage in reasonable settlement discussions during the 60-day notice period. In the absence of productive discussions to resolve this dispute, the County will have cause to file a citizen's suit under the CWA when the 60-day notice period ends. As part of that action, the County will pursue injunctive relief to stop all discharges in violation of the Act, will seek penalties for these discharges and will seek reasonable attorney's fees and costs. In addition to such a citizen suit, the County reserves all rights to assert all other available claims against CDCR related to these discharges, including, but not limited to, breach of the 1985 Agreement. It is the County's hope that CDCR will work with the County to voluntarily resolve these issues, but the County stands ready to pursue its legal options if necessary.

Sincerely,

Greg Gillott
County Counsel

cc:    Andrew Wheeler, Administrator
       U.S. Environmental Protection Agency
       1200 Pennsylvania Avenue, NW
       Washington, D.C. 20460

       John W. Busterud, Regional Administrator
       U.S. Environmental Protection Agency
       Pacific Southwest, Region 9
       75 Hawthorne Street
       San Francisco, CA 94105

       U.S. Attorney General
       U.S. Dept. of Justice
       950 Pennsylvania Ave, NW
       Washington, DC 20530-0001

       Eileen Sobeck, Executive Director
       State Water Resources Control Board
       P.O. Box 100
       Sacramento, CA 95812-0100

Patrick Covello, Warden
California Department of Corrections
Ralph Diaz, Secretary
California Department of Corrections and Rehabilitation
May 15, 2020
Page 11

Patrick Pulupa
Executive Officer
California Regional Water Quality Control Board
Central Valley Region
11020 Sun Center Drive #200
Rancho Cordova, CA 95670

EXHIBIT B

# AMADOR COUNTY COUNSEL
County Administration Center
810 Court Street, Jackson, CA 95642
Telephone (209) 223-6366 ♦ FAX (209) 223-4286



**Via Certified Mail—Return Receipt Requested**

Gregory Gillott, County Counsel
Lesley Gomes, Deputy
Glenn Spitzer, Deputy
Angela Creach, Paralegal

October 2, 2020

Patrick Covello, Warden
California Department of Corrections
Mule Creek State Prison
P.O. Box 409099
Ione, CA 95640

Ralph Diaz, Secretary
California Department of Corrections and Rehabilitation
1515 S Street, #101n
Sacramento, CA 95811

RE:  ***Amended*** **Notice of Violations and Intent to Sue Under the Federal
Water Pollution Control Act (Clean Water Act)**

Dear Warden Covello and Secretary Diaz:

  This Amended Notice of Violations and Intent to Sue ("Notice") is provided on behalf of the County of Amador ("County") with regard to violations of the Federal Water Pollution Control Act, commonly known as the Clean Water Act ("CWA" or "Act"; 33 U.S.C. § 1251 *et seq.*).[1]  The County alleges that the California Department of Corrections and Rehabilitation ("CDCR") is engaging in ongoing violations of the CWA by discharging pollutants from Mule Creek State Prison ("Prison") to Mule Creek, a water of the United States, without a permit as required by the CWA or in violation of any applicable permit(s) related to such discharges.  The County hereby gives CDCR notice of its intent to sue CDCR for these ongoing violations of the CWA starting sixty (60) days after this Notice, unless CDCR enters into a binding agreement with the County to cease all illegal discharges and to fully and promptly remediate all past, current and imminent violations.

**I.**
**Factual Background**

  Mule Creek State Prison opened in June of 1987, and is owned and operated by CDCR.  Originally, the Prison accommodated approximately 2,800 inmates in three facilities and

---

[1] The County sent the original notice on May 15, 2020 and has been engaged in discussions with CDCR counsel about the issues in the original notice.  This Amended Notice is based on new information obtained by the County, additional violations, and the Regional Board's proposed Administrative Civil Liability Order for the Prison.

Patrick Covello, Warden
California Department of Corrections
October 2, 2020
Page 2

their accompanying yards (the "Old Prison").  In 2016, CDCR expanded the Old Prison by constructing the 1,584 inmate Mule Creek Infill Complex ("MCIC").  The construction of MCIC reduced land available for the spraying of treated effluent from the wastewater treatment facility on the site.

The Old Prison was constructed in part in accordance with a 1985 agreement among CDCR, the County, the City of Ione and the Amador County Unified School District.  This agreement permitted CDCR to construct a facility that was larger than the one it had studied in the environmental document it had prepared under the California Environmental Quality Act ("CEQA").  As part of this agreement, CDC agreed to operate the facility in a manner consistent with specific hydrology and wastewater treatment mitigation measures, as well as laws and regulations governing wastewater and the disposal of treated effluent.  As documented in this Notice, CDCR is not operating the facility as required by these measures or in accordance with the laws and regulations governing wastewater and treated effluent, and is thus in violation of the 1985 agreement.

During the last five (5) years, and on an ongoing basis, there have been numerous documented discharges of pollutants from the Prison to Mule Creek. These violations included documented exceedances based on CDCR's own monitoring and violations documented by the Regional Board or local residents. For example, on December 28, 2017, discharges of water described to be at times jet black, sometimes containing solids, and sometimes steaming hot, were discharged to Mule Creek from a pipeline that originated at the Prison.  This discharge originated from a storm water collection and conveyance system that surrounds the Old Prison.  Samples of the water from this system revealed that the discharge contained wastewater comingled with contaminated storm water and grey water.  The discharge contained very high levels of Total Coliform, E. Coli and Fecal Coliform.

Similarly, on multiple occasions in 2018 through 2020, CDCR intentionally discharged millions of gallons of comingled storm water and wastewater to Mule Creek from the Prison. These discharges contained bacteria and industrial pollutants that are illegal to discharge to Mule Creek without a permit. A summary of exceedances of water quality objectives based on analytical laboratory data collected over approximately two years is contained in Exhibit "A" and demonstrates there have been at least 3,104 measured exceedances of water quality objectives within receiving waters adjacent to the Prison, at the Prison's storm drain system outfalls to Mule Creek, and within the storm drain system.

In addition to such ongoing discharges from the various pipes and collection systems at the Prison, there have been documented spills of wastewater to Mule Creek.  For example, in July of 2019, a documented spill of wastewater to Mule Creek occurred.  Similarly, in April of 2018, thirty-three thousand (33,000) gallons of raw sewage was discharged to Mule Creek. Spills have occurred even after the County's original notice.  For example, on May 17, 2020, a spill of 1.25 million gallons of contaminated storm water occurred when the Prison intentionally, and contrary to the Regional Board's direction, opened gates that prevented such discharges.

Patrick Covello, Warden
California Department of Corrections
October 2, 2020
Page 3

Discharges from the Prison to Mule Creek also occur when pollutants from the wastewater system at the Prison are discharged to spray fields that load directly to Mule Creek. For example, on July 25, 2019, Mule Creek downstream of the Prison was full of stagnant water, even though there had been several months of hot, dry weather and even though Mule Creek was dry upstream of the Prison. This condition was a direct result of heavy hydraulic loading from oversaturated wastewater spraying fields, which resulted in either a direct discharge of pollutants to Mule Creek or the effective equivalent of a direct discharge.

Despite causing these direct discharges of pollutants to Mule Creek, or the effective equivalent of such direct discharges, CDCR does not have a National Pollutant Discharge Elimination System ("NPDES") permit that authorizes such discharges or their effective equivalent or is acting in violation of any permit that it does maintain. The CDCR operates the wastewater system at the Prison under Waste Discharge Requirements ("WDR") Order R5-2015-0129, issued by the Central Valley Regional Water Quality Control Board ("Regional Board"). However, the WDR is a permit issued under California law, and does not cover discharges of pollutants to Mule Creek. In addition, the Regional Board has determined that the WDR does not authorize the discharges described in this Notice. Therefore, the discharges of pollutants to Mule Creek from the Prison are illegal discharges made in violation of the Act.

In addition, CDCR did not timely obtain coverage under general NPDES permits that are required for some of the discharges and activities alleged in this Notice, and has not complied with the requirements of general NPDES permits for the limited periods of time during which it has been enrolled under them. Industrial activities at the Prison are now regulated under the *General Permit for Storm Water Discharges Associated with Industrial Activities*, Order 2014-0057-DWQ, as amended ("Industrial Permit"). CDCR did not have coverage under the Industrial Permit for the discharges alleged in this Notice between May 15, 2015 and May 22, 2018, and discharges occurred during that period were illegal discharges without a permit. Subsequently, and over the apparent objection of the Regional Board, the State Board, based on a document dated May 22, 2020, appears to have granted CDCR a "No Exposure Certification" ("NEC") under the Industrial Permit. CDCR is not entitled to such coverage and its actions between May 22, 2018 and the date of this letter are in violation of the Industrial Permit.

Discharges from the storm water conveyance system at the Prison are now regulated under the *National Pollutant Discharge Elimination System Permit for Waste Discharge Requirements for Storm Water Discharges from Small Municipal Separate Storm Sewer Systems*, Order 2013-0001-DWQ ("Small MS4 Permit"). CDCR did not have coverage under the Small MS4 Permit for the discharges from the storm water collection system alleged in this Notice which occurred between May 15, 2015 and April 10, 2019. Discharges during this period were therefore illegal discharges without a permit. The Prison obtained coverage under the Small MS4 Permit on April 10, 2019. Between April 10, 2019 and the date of this letter, CDCR has discharged from the Prison in violation of the Small MS4 Permit.

Patrick Covello, Warden
California Department of Corrections
October 2, 2020
Page 4

Each of the general NPDES permits contains discharge prohibitions, effluent limitations and receiving water limitations that prohibit discharges of pollutants that exceed water quality standards, prohibit the creation of a nuisance or the causing of a condition of pollution, among other requirements.  None of these permits allow CDCR to discharge raw waste, comingled wastewater and storm water, industrial pollutants, including, but not limited to designated wastes such as volatile organic chemicals ("VOCs") and semi-volatile compounds ("SVOCs").  Any discharges that occurred during any period when CDCR had coverage under any of the two general NPDES permits were made in violation of the discharge prohibitions, effluent limitations and the receiving water limitations of those permits, and were thus illegal discharges without a permit.  Therefore, CDCR does not maintain NPDES permits that would permit these discharges to Mule Creek, and CDCR is, has been, and will remain in violation of the CWA.

On July 20, 2020, the Regional Board released a draft *Settlement Agreement and Stipulation for Entry of Administrative Civil Liability Order*, Order No R5-2020-XXX ("Draft Order") for public comment. The Draft Order alleges illegal dry weather discharges from the Prison's storm drain system on 79 days between January 23, 2018 and April 5, 2019. The Draft Order does not address the multiple violations after April 2019 alleged in this Notice nor does it address the violations of the NPDES Permits alleged in this Notice.

If adopted, the Draft Order will impose a monetary penalty of $2.5 million. Half of the penalty amount will be permanently suspended on the condition that CDCR spends $1,250,000 to complete an irrigation replacement project and funds a study by the Southern California Coastal Water Research Project ("SCCWRP"). The Draft Order expressly admits that it does "not address liability for the commingled discharges of storm water and non-stormwater[,]" such as those alleged in this Notice. The Draft Order also recognizes that the discharges, such as those alleged in this Notice, are not the result of the irrigation system. (Draft Order ¶ 17 ("Water Board staff does not believe that the identified non-stormwater sources of irrigation and groundwater are likely sources of waste constituents.") As a result, the irrigation system replacement project will not prevent wastewater discharges to Mule Creek or other problems associated with the wastewater and stormwater system described in this Notice. In addition, the SCCWRP study will not identify or require any corrective measures necessary to prevent illegal discharges described in this Notice from entering Mule Creek.

The County has repeatedly attempted to work with CDCR to eliminate these discharges to Mule Creek.  Similarly, the County has encouraged the Regional Board to diligently prosecute CDCR for these multiple violations of the CWA as alleged in this Notice.  As of today, CDCR has not eliminated these discharges to Mule Creek and the Regional Board has not commenced nor diligently prosecuted CDCR for the repeated and ongoing violations of the CWA.  Therefore, the County has no choice but to provide this Notice, and, unless CDCR enters into a binding agreement to cease and desist the discharges, and remediate the pollution they have created, the County will have no choice but to sue CDCR over these ongoing violations.

Patrick Covello, Warden
California Department of Corrections
October 2, 2020
Page 5

## II.
## Clean Water Act Requirements

The CWA prohibits the "discharge of any pollutant by a person" without a permit issued under the Act. (33 U.S.C. § 1311(a).) The CWA defines a "discharge of a pollutant" as the addition of any pollutant to navigable waters from a point source. (33 U.S.C. § 1362(12).) The Act further defines a point source as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container . . . ." (33 U.S.C. § 1362(14).) The United States Supreme Court has recently clarified that a "discharge of a pollutant" occurs under the Act when there is either a discharge from a point source directly into navigable waters or when there is the functional equivalent of a direct discharge. (*County of Maui, Hawaii v. Hawaii Wildlife Fund* 590 U.S. ___ (2020).

All direct discharges of pollutants from a point source or the functional equivalent of such direct discharges are illegal unless done in accordance with a permit issued under the Act. As relevant here, the CWA establishes the NPDES program to permit certain discharges of pollutants to navigable waters. (33 U.S.C § 1342.) In California, the State Water Resources Control Board ("State Board") and the nine Regional Water Quality Control Boards, including the Regional Board, have been authorized by the Environmental Protection Agency ("EPA") to issue permits under the NPDES program. Discharges of pollutants to Mule Creek therefore require an NPDES permit issued by the State Board or the Regional Board. Discharges of pollutants to Mule Creek that occur without an NPDES permit, or in violation of an NPDES permit, are violations of the Act. (33 U.S.C. § 1311 (a).)

The CWA provides that enforcement of the Act may be commenced by persons acting under the citizen suit provisions of the statute. (33 U.S.C § 1365.) The County is exercising its rights under these provisions of the Act to enforce compliance by CDCR with the CWA, and to stop these ongoing illegal discharges to Mule Creek.

The Draft Order does not address the illegal discharges covered in this Notice nor does it address the specific violations of the NPDES Permits asserted in this Notice. Therefore, the Draft Order does not bar the County from proceeding with litigation based on this Notice because a citizen suit may only be precluded where the State has commenced and is diligently prosecuting a civil or criminal action under the Clean Water Act in a court of the United States or if the State has imposed an administrative penalty action comparable to one under the Clean Water Act. (33 U.S.C. §§ 1319, subd. (g), 1365, subd. (b); see also *California Sportfishing Protection Alliance v. Chico Scrap Metal, Inc.* (9th Cir. 2013) 728 F.3d 868.) A State-initiated administrative or court action will not bar a citizen suit that alleges different violations of the Clean Water Act or seeks to enforce different standards and limitations of permit. (See *Cal. Sportfishing*, 728 F.3d at 874-75.)

Patrick Covello, Warden
California Department of Corrections
October 2, 2020
Page 6

### III.
### Notice Requirements

The Act and its implementing regulations provide that a 60-day notice should include sufficient information to permit the recipient to identify the standard, limitation or order alleged to be violated, the activity alleged to constitute the violation, the person or persons responsibility for the alleged violation, the location of the alleged violation, the date or dates of the alleged violation and the identity of the person giving notice.  That information is set forth below.

**A.      The Specified Standard, Limitation, or Order Alleged to Have Been Violated**

The discharges alleged in this Notice are unlawful under 33 U.S.C. sections 1311(a) and 1342(p) of the Act because the discharges were made without a permit or in a manner that violates the NEC coverage under the Industrial Permit or the Small MS4 Permit applicable to the Prison.[2] CDCR appears to have obtained NEC coverage under the Industrial Permit on May 22, 2018, and coverage under the Small MS4 Permit for stormwater discharges from the Prison's storm water conveyance system on April 10, 2019.

Discharges from the Prison occurring after May 22, 2018 and containing pollutants associated with industrial materials or activities, such as metals, are set forth in Exhibit A to this Notice and violate the Industrial Permit's prohibition against "discharges of liquids or materials other than storm water, either directly or indirectly to waters of the United States," discharges that occur without implementation of best management practices, discharges that "cause or contribute to an exceedance of any applicable water quality standards in any affected receiving water[,]" and discharges that occur after exposure to industrial materials or activities under an NEC authorization. (Industrial Permit, Sections III (Discharge Prohibitions), V (Effluent Limitations), VI (Receiving Water Limitations), and XVII (Condition Exclusion – No Exposure Certification).)[3] As is shown in Exhibit A, the presence of these metals and other pollutants within the Prison's storm water conveyance system – before discharging and at the discharge points – suggests that exposure to industrial activities and materials has occurred in violation of the Industrial Permit's no exposure requirement and in violation of the discharge prohibitions,

---

[2] The County's original notice identified numerous discharges of pollutants from the Prison to Mule Creek *without* an NPDES permit in violation of the CWA.  (33 U.S.C § 1311(a).)  These discharges without a permit violated the CWA, which provides that: "Except as in compliance with this section and sections 302, 306, 307, 318, 402, 404 of this Act, the discharge of any pollutant by any person shall be unlawful."  The discharges of pollutants from the Prison to Mule Creek were unlawful under 33 U.S.C. section 1311(a) because CDCR did not have an NPDES or other federal permit that allowed those discharges to occur.

[3] The Industrial Permit conditionally excludes industrial facilities that "have no exposure of industrial activities and materials to storm water discharges" from certain obligations of the Industrial Permit. (Industrial Permit, Finding 70 and Provision II.B.2.) Facilities with NEC coverage are not granted a conditional exclusion from the discharge prohibitions, effluent limitations or receiving water limitations of the Industrial Permit. "No Exposure" under the Industrial Permit means "all Industrial Materials and Activities are protected by a Storm-Resistant Shelter to prevent all exposure to rain, snow, snowmelt, and/or runoff." (Industrial Permit, Provision XVII.B.1.)

Patrick Covello, Warden
California Department of Corrections
October 2, 2020
Page 7

effluent limitations, and receiving water limitations. (See Industrial Permit, Sections III, V, VI, and XVII.)

Discharges from the Prison's storm water conveyance system after April 10, 2019 set forth in Exhibit A to this Notice violate the Small MS4 Permit's prohibitions against the discharge of non-storm water (including wastewater), discharges that cause or threaten conditions of pollution or nuisance, discharges that violate effluent limitations such as hazardous substances, and discharges that "cause or contribute to an exceedance of water quality standards . . . ." (See Small MS4 Permit, Sections B (Discharge Prohibitions), C (Effluent Limitations) and D (Receiving Water Limitations).) As is shown in Exhibit A, the presence of E. Coli within the Prison's storm water conveyance system – before discharging and at the discharge points – demonstrates that there is pollutants associated with sewage and wastewater collection are entering the storm drain system from inside the Prison.

Because the discharges alleged in this Notice violate the discharge prohibitions, effluent limitations, receiving water limitations, and no exposure limitations of these permits, they are illegal discharges under the Act.

**B.      The Activity Alleged to Constitute a Violation**

The County contends that from May 15, 2015 to October 2, 2020, CDCR has violated the Act as described in this Notice. The County contends these violations are continuing or have the likelihood of occurring in the future. As is shown in Exhibit A to this Notice analytical laboratory data collected over more than two years demonstrates there have been at least 3,104 measured exceedances of water quality objectives within receiving waters adjacent to the Prison, at the Prison's storm drain system outfalls to Mule Creek, and within the storm drain system.

1.      Direct Discharges to Mule Creek. The County has documented multiple and ongoing direct discharges of pollutants to Mule Creek. In some cases, the discharges involve millions of gallons of polluted water. Representative examples of CDCR activities alleged to violate 33 U.S.C sections 1311(a) and 1342(p) include:

a.      December 28, 2017. On December 28, 2017, CDCR illegally discharge pollutants from a newly constructed storm water pipeline directly to Mule Creek. This discharge contained high levels of bacteria and other pollutants. This discharge was just one of a regular daily discharge observed between August 2017 and January 2018. These discharges included water that was described as at times being jet black, sometimes containing solids, and sometimes steaming hot.

b.      March 22 and 23, 2018. On March 22, 2018, CDCR intentionally discharged 1,250,000 gallons of cominged storm water and wastewater to Mule Creek. The details of this discharge are set forth in OES Report 18-1892. On March 23, 2018, CDCR

Patrick Covello, Warden
California Department of Corrections
October 2, 2020
Page 8

updated OES Report 18-1892 to report a total discharge of 1,600,000 gallons to Mule Creek. This discharge included pathogens, VOCs and SVOCs, among other pollutants.

      c.      April 6, 2018.  On April 6, 2018, CDCR discharged 33,000 gallons of raw sewage to Mule Creek.  The details of this discharge of raw sewage are set forth in OES Report 18-2255.  This discharge included bacteria.

      d.      April 6-7, 2018.  On April 6 and 7, 2018, CDCR discharged 1,600,000 gallons of comingled storm water and wastewater to Mule Creek.  The details of this discharge are set forth in OES Report 18-2307.  This discharge included pathogens, VOCs and SVOCs, among other pollutants.

      e.      May 25, 2018.  On May 25, 2018, CDCR discharged 200,000 to 350,000 gallons of commingled storm water and wastewater to Mule Creek.  The details of this discharge are set forth in OES Report 18-3383.  This discharge included pathogens, VOCs and SVOCs, among other pollutants.

      f.      August 17, 2018.  On August 17, 2018, in a letter and report to the Regional Board, CDCR self-reported that it regularly conducted wash down activities over its storm drain facilities.  These activities resulted in illegal discharges of industrial and other pollutants from the storm drains to Mule Creek.

      g.      July 13, 2019.  On July 13, 2019, CDCR spilled 5,000 gallons of effluent directly to Mule Creek.  This discharge included pathogens in excess of water quality standards.

      h.      May 17, 2020. On May 17, 2020, CDCR spilled 1.25 million gallons of commingled storm water and wastewater to Mule Creek.  The details of this discharge are set forth in OES Report 20-2694. This discharge also demonstrates that the violations alleged in this Notice are ongoing and are likely to continue.

      2.      Functional Equivalent of Direct Discharges to Mule Creek.  In addition to these numerous and ongoing direct discharges, CDCR is also performing activities that have resulted in the functional equivalent of direct discharges to Mule Creek.  When CDCR constructed the MCIC, it reduced the land available for the spraying of effluent from the wastewater treatment facility at the Prison.  This reduction in land has resulted in the over spraying of the remaining land available.  This over spraying has resulted in oversaturation of the remaining spray fields. This has caused seepage from the spray fields into Mule Creek. As is demonstrated in Exhibit A, exceedances of bacterial indicators in Mule Creek adjacent to the land application areas indicate significant discharges from the Prison's effluent disposal activities.

      This seepage is the functional equivalent of direct discharges to Mule Creek, and is prohibited without an NPDES permit.  None of the three general NPDES permits would permit this discharge of wastewater effluent to Mule Creek, and any state permit issued by the Regional

Patrick Covello, Warden
California Department of Corrections
October 2, 2020
Page 9

Board under state law would not be sufficient to permit these discharges under the Act . Despite not having a permit for these discharges, CDCR continues to engage in this functional equivalent to a direct discharge.  These activities are well documented.  For example, on July 25, 2019, Regional Board staff documented stagnant water in Mule Creek downstream of the spray fields, even though the Creek was dry upstream and even though then had been several months of hot, dry weather.  These ongoing discharges result in the regular discharge of pathogens, VOCs and SVOCs, among other pollutants, to Mule Creek in violation of the Act.

The claims in this Notice are different from the allegations in the Draft Order. First, this Notice covers a broader time period than is alleged in the Draft Order. The violations subject to the Draft Order begin in January 2018 and end in April 2019. This Notice alleges violations beginning in May 15, 2015 and extending beyond April 2019. This Notice also alleges the violations will continue despite implementation of the irrigation replacement project and SCCWRP study. Second, the Draft Order does not allege violations of any NPDES permit provisions or any violations resulting from the sprayfields. This Notice alleges violations of the Small MS4 Permit and the Industrial Permit. It also alleges unpermitted discharges in violation of the Clean Water Act occurring from the sprayfields. As a result, the Clean Water Act violations alleged in this Notice are not addressed by or barred by the potential adoption of the Draft Order.

## C.    The Person or Persons Responsible for the Alleged Violation

The entity responsible for the alleged violation identified in this Notice is the CDCR and those of its employees or agents responsible for compliance with the CWA and with any applicable state and federal regulations and permits.  CDCR owns and operates the Prison, its wastewater facility, its conveyance systems and other infrastructure that results in the discharges alleged in this Notice.  The treatment system at the facility does also treat wastewater generated from the Preston Youth Correctional Facility and the California Department of Forestry Fire Training Academy, in addition to the Prison's wastewater, but the violations alleged in this Notice are the sole result of the activities, inactions and facilities of CDCR.

## D.    The Location of the Alleged Violation

The location of the alleged violations is the portion of Mule Creek adjacent to the Prison that has received the pollutants from the direct and indirect discharges referred to in this Notice, including but not limited to the storm sewer collection system outfall(s) to Mule Creek.  The specific location for each alleged discharge is set forth in the reports referred to in this Notice, in records created and/or maintained by CDCR, as well as in reports and records created and/or maintained by the Regional Board.  The Prison is located at 4001 on Highway 104 in the City of Ione in Amador County, and the discharges alleged in this Notice all originated at the Prison and were conveyed to the adjacent Mule Creek.

Patrick Covello, Warden
California Department of Corrections
October 2, 2020
Page 10

**E.    The Date or Dates of Violations or a Reasonable Range of Dates During Which the Alleged Activity Occurred**

The range of dates covered by this Notice is May 15, 2015 to October 2, 2020 and ongoing.  The County may from time to time update this Notice to include additional violations of the CWA by the CDCR which occur during or after the range of dates currently covered.  Some violations are continuous, and therefore each day constitutes a violation. (See Exhibit A to this Notice for a list of currently known known violations.)  As described in this Notice, and by way of illustration only, specific violations highlighted in this Notice occurred on December 28, 2017, March 22, 2018, March 23, 2018, April 7, 2018, May 25, 2018, August 17, 2018, July 13, 2019, July 25, 2019, May 17, 2020.

**F.    The Full Name, Address and Telephone Number of the Person Giving Notice**

The entity giving this Notice is the County of Amador, a municipal corporation.  The County's mailing address is 810 Court Street, Jackson, California, 95642.  This Notice is being provided by the County Counsel for the County of Amador at the direction of the Board of Supervisors of the County.  Please direct all correspondence regarding this Notice to Gregory Gillott, Amador County Counsel, 810 Court Street, Jackson, CA, 95642, (209) 223-6213, ggillot@amadorgov.org.

The County and the residents of the County have sustained, and continue to sustain, direct injuries due to CDCR's violations of the CWA that are subject to redress through litigation under the Act.  The discharges alleged in this Notice have caused the County to incur substantial costs associated with the pollutants discharged to Mule Creek and the pollution of the groundwater basin.  The pollution has also deteriorated the quality of the Mule Creek area, resulting in lost recreational and other opportunities that in turn have resulted in a fiscal impact to the County through lost sales and other taxes.  Similarly, the pollution has also impacted the residents of the County, including by depriving them of recreational opportunities and also resulting in pollution of private and public wells and land in the area.  The County provides this Notice and will pursue litigation if necessary to redress these direct injuries that are caused by CDCR's violations of the CWA.

**IV.**
**Cease and Desist Demand and Remedial Measures**

During the 60-day notice period, the County stands ready to meet with CDCR to discuss a possible resolution of the issues presented in this Notice.  If a reasonable written settlement can be reached during the 60-day notice period, the County would be willing to consider foregoing this litigation.  However, a reasonable settlement would need to include:

- An immediate commitment to cease and desist all unpermitted discharges;

Patrick Covello, Warden
California Department of Corrections
October 2, 2020
Page 11

- An agreement to comply with all discharge prohibitions, effluent limitations and receiving water limitations of the Small MS4 Permit and the Industrial Permit, as applicable, to the extent CDCR has obtained coverage under any of these permits.

- An agreement to timely obtain all additional NPDES permits required, in addition to the renewal or expansion of state permits related to the wastewater system to include provisions sufficient to treat the industrial pollutants from the facility and to end the indirect discharges from the spray fields to Mule Creek;

- An agreement to remediate the pollution to Mule Creek and to the associated groundwater basin, including impacts to public and private land and wells;

- Reasonable compensation for the County's costs and fees.

**V.**
**Conclusion**

Please contact County Counsel Gregory Gillott if you are willing to engage in reasonable settlement discussions during the 60-day notice period. In the absence of productive discussions to resolve this dispute, the County will have cause to file a citizen's suit under the CWA when the 60-day notice period ends. As part of that action, the County will pursue injunctive relief to stop all discharges in violation of the Act, will seek penalties for these discharges and will seek reasonable attorney's fees and costs. In addition to such a citizen suit, the County reserves all rights to assert all other available claims against CDCR related to these discharges, including, but not limited to, breach of the 1985 Agreement. It is the County's hope that CDCR will work with the County to voluntarily resolve these issues, but the County stands ready to pursue its legal options if necessary.

Sincerely,

Greg Gillott
County Counsel

cc:   Andrew Wheeler, Administrator
      U.S. Environmental Protection Agency
      1200 Pennsylvania Avenue, NW
      Washington, D.C. 20460

      Mike Stoker, Regional Administrator
      U.S. Environmental Protection Agency

Patrick Covello, Warden
California Department of Corrections
October 2, 2020
Page 12

Pacific Southwest, Region 9
75 Hawthorne Street
San Francisco, CA 94105

U.S. Attorney General
U.S. Dept. of Justice
950 Pennsylvania Ave, NW
Washington, DC 20530-0001

Eileen Sobeck, Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, CA 95812-0100

Patrick Pulupa
Executive Officer
California Regional Water Quality Control Board
Central Valley Region
11020 Sun Center Drive #200
Rancho Cordova, CA 95670

# EXHIBIT A

# SUMMARY OF EXCEEDANCES

Case 3:21-cv-00038-WBS-AC   Document 1   Filed 01/07/21   Page 48 of 69

| Constituent | Units | WQO | Tower #2 # Samples | Tower #2 # Exceedances | Tower #3 # Samples | Tower #3 # Exceedances | MCSP6 # Samples | MCSP6 # Exceedances | MCSP3 # Samples | MCSP3 # Exceedances | Tower #4 # Samples | Tower #4 # Exceedances | Tower #9 # Samples | Tower #9 # Exceedances | MCSP5 # Samples | MCSP5 # Exceedances | MCSP2 # Samples | MCSP2 # Exceedances | Discharge Exceedances | MCSP1 # Samples | MCSP1 # Exceedances | Location #1 # Samples | Location #1 # Exceedances | Location #3 # Samples | Location #3 # Exceedances | Receiving Water Exceedances | Total Exceedances |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Organics** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Benzene | µg/L | 1 | 11 | 0 | 277 | 0 | 9 | 0 | 5 | 0 | 230 | 0 | 29 | 0 | 16 | 0 | 2 | 0 | *0* | 35 | 0 | 7 | 0 | 41 | 0 | *0* | *0* |
| Bromodichloromethane | µg/L | 0.56 | | | 1 | 1 | | | | | | | | | | | | | *1* | | | | | | | *0* | *1* |
| Bromoform | µg/L | 4.3 | | | 2 | 0 | | | | | | | | | | | | | *0* | | | | | | | *0* | *0* |
| Butyl benzyl phthalate | µg/L | 3000 | | | 1 | 0 | | | | | 1 | 0 | | | | | | | *0* | | | | | | | *0* | *0* |
| Chloroform | µg/L | 80 | 1 | 0 | 12 | 0 | 1 | 0 | | | 10 | 0 | | | 3 | 0 | | | *0* | | | | | 1 | 0 | *0* | *0* |
| Dibromochloromethane | µg/L | 0.41 | | | 1 | 1 | | | | | | | | | | | | | *1* | | | | | | | *0* | *1* |
| Diethyl phthalate | µg/L | 23000 | 1 | 0 | 7 | 0 | 5 | 0 | 2 | 0 | 5 | 0 | 5 | 0 | 7 | 0 | 1 | 0 | *0* | | | | | 8 | 0 | *0* | *0* |
| Ethylbenzene | µg/L | 300 | 11 | 0 | 277 | 0 | 9 | 0 | 5 | 0 | 230 | 0 | 29 | 0 | 16 | 0 | 2 | 0 | *0* | 35 | 0 | 7 | 0 | 41 | 0 | *0* | *0* |
| Pentachlorophenol | µg/L | 0.28 | | | 2 | 2 | | | | | | | 1 | 1 | | | | | *3* | | | | | | | *0* | *3* |
| Phenol | µg/L | 21000 | | | | | | | | | | | 1 | 0 | | | | | *0* | | | | | | | *0* | *0* |
| Toluene | µg/L | 150 | 11 | 0 | 277 | 0 | 9 | 0 | 5 | 0 | 230 | 0 | 29 | 0 | 16 | 0 | 2 | 0 | *0* | 35 | 0 | 7 | 0 | 41 | 0 | | *0* |
| Xylenes (total) | µg/L | 1750 | 11 | 0 | 277 | 0 | 9 | 0 | 5 | 0 | 230 | 0 | 29 | 0 | 16 | 0 | 2 | 0 | *0* | 35 | 0 | 7 | 0 | 41 | 0 | | *0* |
| **Microbial** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| E. Coli | MPN/100mL | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Complete dataset | | | 10 | | 292 | | 36 | | 25 | | 229 | | 29 | | 48 | | 18 | | | 76 | | 7 | | 82 | | | |
| Geomean (from Feb 4, 2019) | | 100 | 0 | | 38 | 16 | 36 | 16 | 25 | 8 | 1 | 0 | 8 | 1 | 48 | 13 | 18 | 3 | *57* | 69 | 23 | 0 | | 67 | 54 | *77* | *134* |
| STV (from Feb 4, 2019) | | 320 | 0 | | 38 | 11 | 36 | 6 | 25 | 7 | 1 | 0 | 8 | 1 | 48 | 8 | 18 | 7 | *40* | 69 | 7 | 0 | | 67 | 11 | *18* | *58* |
| Fecal Coliforms | MPN/100mL | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Complete dataset | | | 10 | | 283 | | 15 | | 11 | | 229 | | 29 | | 22 | | 4 | | | 45 | | 7 | | 51 | | | |
| Geomean (prior to Feb 4, 2019) | | 200 | 10 | 3 | 254 | 185 | 0 | 0 | 0 | 0 | 228 | 154 | 21 | 7 | 0 | 0 | 0 | 0 | *349* | 7 | 0 | 7 | 0 | 15 | 0 | *0* | *349* |
| STV (prior to Feb 4, 2019) | | 400 | 10 | 1 | 254 | 0 | 0 | | 0 | | 228 | 0 | 21 | 1 | 0 | | 0 | | *2* | 7 | 0 | 7 | 0 | 15 | 0 | *0* | *2* |
| **GenChem** | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Chloride | mg/L | 250 | 11 | 0 | 277 | 0 | 9 | 0 | 5 | 0 | 230 | 0 | 29 | 0 | 16 | 0 | 2 | 0 | *0* | 35 | 0 | 7 | 0 | 41 | 0 | *0* | *0* |
| MBAS | mg/L | 0.5 | 11 | 0 | 234 | 6 | | | | | 229 | 6 | 11 | 0 | | | | | *12* | 1 | 0 | 7 | 0 | 8 | 0 | *0* | *12* |
| Nitrate + Nitrite as N | mg/L | 10 | 11 | 0 | 252 | 0 | 9 | 0 | 5 | 0 | 223 | 0 | 29 | 1 | 16 | 0 | 2 | 0 | *1* | 35 | 0 | 7 | 0 | 40 | 0 | *0* | *1* |
| Nitrate as N | mg/L | 10 | 11 | 0 | 253 | 0 | 9 | 0 | 5 | 0 | 220 | 0 | 29 | 1 | 15 | 0 | 2 | 0 | *1* | 33 | 0 | 7 | 0 | 39 | 0 | *0* | *1* |
| Nitrite as N | mg/L | 1 | 10 | 0 | 247 | 1 | 9 | 0 | 5 | 0 | 216 | 1 | 28 | 0 | 16 | 0 | 2 | 0 | *2* | 35 | 0 | 7 | 0 | 41 | 0 | *0* | *2* |
| pH (units) | SU | >6.5 | 11 | 0 | 235 | 13 | | | | | 228 | 15 | 12 | 0 | | | | | *28* | 1 | 0 | 7 | 0 | 9 | 1 | *1* | *29* |
| pH (units) | SU | <8.5 | 11 | 0 | 235 | 9 | | | | | 228 | 8 | 12 | 0 | | | | | *17* | 1 | 0 | 7 | 0 | 9 | 0 | *0* | *17* |
| Specific Conductance (EC) | uS/cm | 900 | 11 | 0 | 234 | 1 | | | | | 229 | 0 | 11 | 0 | | | | | *1* | 1 | 0 | 7 | 0 | 8 | 0 | *0* | *1* |
| Sulfate as SO4 | mg/L | 250 | 11 | 0 | 277 | 0 | 9 | 0 | 5 | 0 | 230 | 0 | 29 | 0 | 16 | 0 | 2 | 0 | *0* | 35 | 0 | 7 | 0 | 41 | 0 | *0* | *0* |
| Total Dissolved Solids | mg/L | 500 | 11 | 0 | 277 | 2 | 9 | 0 | 5 | 0 | 230 | 0 | 29 | 0 | 16 | 0 | 2 | 0 | *2* | 35 | 1 | 7 | 0 | 41 | 0 | *1* | *3* |
| Turbidity (NTU) | NTU | 1 | 11 | 11 | 234 | 230 | | | | | 229 | 219 | 11 | 11 | | | | | *471* | 1 | 0 | 7 | 5 | 8 | 8 | *13* | *484* |

| Constituent | Units | WQO | Tower #2 # Samples | Tower #2 # Exceedances | Tower #3 # Samples | Tower #3 # Exceedances | MCSP6 # Samples | MCSP6 # Exceedances | MCSP3 # Samples | MCSP3 # Exceedances | Tower #4 # Samples | Tower #4 # Exceedances | Tower #9 # Samples | Tower #9 # Exceedances | MCSP5 # Samples | MCSP5 # Exceedances | MCSP2 # Samples | MCSP2 # Exceedances | Discharge Exceedances | MCSP1 # Samples | MCSP1 # Exceedances | Location #1 # Samples | Location #1 # Exceedances | Location #3 # Samples | Location #3 # Exceedances | Receiving Water Exceedances | Total Exceedances |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Metals** | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Aluminum | µg/L | 200 | 10 | 10 | 278 | 146 | 9 | 4 | 5 | 5 | 230 | 123 | 30 | 22 | 16 | 11 | 2 | 2 | 323 | 35 | 11 | 7 | 2 | 41 | 27 | 40 | 363 |
| Antimony | µg/L | 6 | 6 | 0 | 235 | 0 | | | 1 | 0 | 229 | 1 | 12 | 0 | | | | | 1 | | | 7 | 0 | 7 | 0 | 0 | 1 |
| Arsenic | µg/L | 10 | 10 | 0 | 278 | 19 | 9 | 2 | 5 | 0 | 229 | 65 | 30 | 0 | 16 | 1 | 2 | 0 | 87 | 35 | 0 | 7 | 0 | 41 | 0 | 0 | 87 |
| Barium | µg/L | 1000 | 5 | 0 | 215 | 0 | 9 | 0 | 4 | 0 | 184 | 0 | 23 | 0 | 16 | 0 | 2 | 0 | 0 | 35 | 0 | 7 | 0 | 41 | 0 | 0 | 0 |
| Beryllium | µg/L | 4 | 5 | 0 | 172 | 0 | | | | | 184 | 0 | 5 | 0 | | | | | 0 | | | 7 | 0 | 7 | 0 | 0 | 0 |
| Cadmium | µg/L | 2.5 | 10 | 0 | 278 | 1 | 9 | 0 | 5 | 0 | 229 | 0 | 30 | 0 | 16 | 0 | 2 | 0 | 1 | 35 | 0 | 7 | 0 | 41 | 0 | 0 | 1 |
| Chromium | µg/L | 50 | 10 | 0 | 278 | 2 | 9 | 0 | 5 | 0 | 229 | 1 | 30 | 2 | 16 | 1 | 2 | 0 | 6 | 35 | 0 | 7 | 0 | 41 | 0 | 0 | 6 |
| Copper | µg/L | 9.3 | 5 | 5 | 173 | 107 | | | | | 185 | 118 | 5 | 4 | | | | | 234 | | | 7 | 0 | 6 | 3 | 3 | 237 |
| Hexavalent Chromium | µg/L | 10 | | | 1 | 0 | | | | | 1 | 0 | | | | | | | 0 | | | | | | | 0 | 0 |
| Iron | µg/L | 300 | 10 | 10 | 278 | 173 | 9 | 8 | 5 | 5 | 229 | 177 | 30 | 26 | 16 | 15 | 2 | 2 | 416 | 35 | 17 | 7 | 2 | 41 | 34 | 53 | 469 |
| Lead | µg/L | 3.2 | 10 | 2 | 278 | 11 | 9 | 1 | 5 | 0 | 229 | 7 | 30 | 4 | 16 | 2 | 2 | 0 | 27 | 35 | 0 | 7 | 0 | 41 | 7 | 7 | 34 |
| Manganese | µg/L | 50 | 10 | 5 | 235 | 40 | | | 1 | 0 | 229 | 31 | 12 | 5 | | | | | 81 | | | 7 | 1 | 7 | 3 | 4 | 85 |
| Mercury | µg/L | 0.05 | 3 | 0 | 195 | 2 | 9 | 0 | 4 | 1 | 164 | 2 | 21 | 0 | 16 | 1 | | | 6 | 35 | 0 | 4 | 0 | 38 | 1 | 1 | 7 |
| Nickel | µg/L | 52 | 10 | 0 | 234 | 3 | | | 1 | 0 | 229 | 2 | 12 | 0 | | | | | 5 | | | 7 | 0 | 7 | 0 | 0 | 5 |
| Selenium | µg/L | 5 | 10 | 0 | 278 | 0 | 9 | 0 | 5 | 0 | 229 | 0 | 30 | 0 | 16 | 0 | 2 | 0 | 0 | 35 | 0 | 7 | 0 | 41 | 1 | 1 | 1 |
| Silver | µg/L | 4.1 | 5 | 0 | 215 | 0 | 9 | 0 | 4 | 0 | 184 | 0 | 23 | 0 | 16 | 0 | 2 | 0 | 0 | 35 | 0 | 7 | 0 | 41 | 0 | 0 | 0 |
| Thallium | µg/L | 1.7 | 5 | 0 | 172 | 0 | | | | | 184 | 0 | 5 | 0 | | | | | 0 | | | 7 | 0 | 7 | 0 | 0 | 0 |
| Zinc | µg/L | 120 | 10 | 1 | 278 | 272 | 9 | 8 | 5 | 3 | 229 | 36 | 30 | 7 | 16 | 4 | 2 | 1 | 332 | 35 | 0 | 7 | 0 | 41 | 7 | 7 | 339 |
| **Dissolved Metals** | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Aluminum | µg/L | 200 | 11 | 0 | 234 | 5 | | | | | 229 | 4 | 11 | 1 | | | | | 10 | 1 | 0 | 7 | 0 | 8 | 0 | 0 | 10 |
| Antimony | µg/L | 6 | 11 | 0 | 234 | 0 | | | | | 229 | 1 | 11 | 0 | | | | | 1 | 1 | 0 | 7 | 0 | 8 | 0 | 0 | 1 |
| Arsenic | µg/L | 10 | 11 | 0 | 234 | 15 | | | | | 229 | 63 | 11 | 0 | | | | | 78 | 1 | 0 | 7 | 0 | 8 | 0 | 0 | 78 |
| Barium | µg/L | 1000 | | | | | | | | | | | | | | | | | 0 | | | | | | | 0 | 0 |
| Beryllium | µg/L | 4 | | | | | | | | | | | | | | | | | 0 | | | | | | | 0 | 0 |
| Cadmium | µg/L | 2.2 | 11 | 0 | 234 | 0 | | | | | 229 | 0 | 11 | 0 | | | | | 0 | 1 | 0 | 7 | 0 | 8 | 0 | 0 | 0 |
| Chromium | µg/L | 50 | 11 | 0 | 234 | 0 | | | | | 229 | 0 | 11 | 0 | | | | | 0 | 1 | 0 | 7 | 0 | 8 | 0 | 0 | 0 |
| Copper | µg/L | 9 | | | 1 | 0 | | | | | 1 | 1 | | | | | | | 1 | | | | | | | 0 | 1 |
| Hexavalent Chromium | µg/L | 10 | | | 1 | 0 | | | | | 1 | 0 | | | | | | | 0 | | | | | | | 0 | 0 |
| Iron | µg/L | 300 | 11 | 0 | 234 | 5 | | | | | 229 | 9 | 11 | 2 | | | | | 16 | 1 | 0 | 7 | 0 | 8 | 0 | 0 | 16 |
| Lead | µg/L | 2.5 | 11 | 1 | 234 | 1 | | | | | 229 | 0 | 11 | 0 | | | | | 2 | 1 | 0 | 7 | 0 | 8 | 0 | 0 | 2 |
| Manganese | µg/L | 50 | 11 | 3 | 234 | 9 | | | | | 229 | 9 | 11 | 0 | | | | | 21 | 1 | 0 | 7 | 0 | 8 | 1 | 1 | 22 |
| Mercury | µg/L | 0.05 | | | | | | | | | | | | | | | | | 0 | | | | | | | 0 | 0 |
| Nickel | µg/L | 52 | 11 | 0 | 234 | 1 | | | | | 229 | 1 | 11 | 0 | | | | | 2 | 1 | 0 | 7 | 0 | 8 | 0 | 0 | 2 |
| Selenium | µg/L | 5 | 11 | 0 | 234 | 1 | | | | | 229 | 0 | 11 | 0 | | | | | 1 | 1 | 0 | 7 | 0 | 8 | 0 | 0 | 1 |
| Silver | µg/L | 3.4 | | | | | | | | | | | | | | | | | 0 | | | | | | | 0 | 0 |
| Thallium | µg/L | 1.7 | | | | | | | | | | | | | | | | | 0 | | | | | | | 0 | 0 |
| Zinc | µg/L | 117 | 11 | 0 | 234 | 221 | | | | | 229 | 14 | 11 | 1 | | | | | 236 | 1 | 0 | 7 | 0 | 8 | 2 | 2 | 238 |
| **Total Exceedances** | | | | 52 | | 1512 | | 45 | | 29 | | 1068 | | 98 | | 56 | | 15 | 2875 | | 59 | | 10 | | 160 | 229 | 3104 |

EXHIBIT C

*Cu MCSP*
*H 11/30/01*

BEFORE THE BOARD OF SUPERVISORS OF THE
COUNTY OF AMADOR,  STATE OF CALIFORNIA

IN THE MATTER OF:

RESOLUTION APPROVING AGREEMENT WITH )
CALIFORNIA DEPARTMENT OF CORRECTIONS) RESOLUTION NO. 85-289
RELATIVE TO IONE PRISON             )

    BE  IT RESOLVED by the Board of Supervisors of the County of
Amador, State of California, that said Board does hereby approve
the contract by and among  the  County of Amador, the Amador
County Unified School District, the City of Ione, and the  State
of California Department  of  Corrections on the  terms  and
conditions contained therein as it pertains to the proposed Ione
Prison.

    BE  IT  FURTHER  RESOLVED that the Chairman of said Board is
hereby authorized to sign said agreement on behalf of the County
of  Amador  contingent  upon the signing of the agreement by the
Department of Corrections.

    The foregoing resolution was duly passed and adopted by  the
Board of  Supervisors  of  the  County of  Amador at a regular
meeting thereof, held on the 10th day of September, 1985, by the
following vote:

    AYES:    Timothy R. Davenport, Edward T. Bamert, Steve
             Martin, Kenneth H. Deaver, and John C. Begovich

    NOES:    None

    ABSENT:    None

Chairman, Board of Supervisors

ATTEST:

CATHERINE J. GIANNINI,   Clerk of the
Board of Supervisors,  Amador County,
California

<u>CONTRACT</u>

This contract is formed and entered into by and among the County of Amador ("County" hereinafter), the Amador County Unified School District ("District" hereinafter), the City of Ione ("City" hereinafter) and the State of California acting through the Department of Corrections ("Department" hereinafter), this 9th day of September, 1985, on the following terms and conditions.

WHEREAS, Department desires to build a 1,700 bed prison at the Mule Creek site in Amador County; and

WHEREAS, Department had proposed to build a 1,200 bed prison at said site; and

WHEREAS, Department has produced a Draft Environmental Impact Report and a Final Environmental Impact Report and Statement of Findings pursuant to the California Environmental Quality Act; and

WHEREAS, said Draft EIR, Final EIR, and Statement of Findings all pertain to a 1,200 bed prison at Ione; and

WHEREAS, Department desires to obtain legislation exempting the 1,700-bed prison from CEQA review; and

WHEREAS, County, District and City are willing to support Department's attempt to obtain legislation exempting said prison from said CEQA review on certain terms and conditions all as set forth herein.

IT IS AGREED by and between the parties hereto as follows:

1.   The Department shall timely carry out and implement completely all of the conditions and mitigation measures in the Amended Statement of Findings attached hereto and by this reference included in full herein.  The parties understand and agree that said conditions and mitigation measures are for a 1,200-bed prison, including overcrowding to an increased population of 2200 inmates, and shall be augmented as required by the proposed increase of beds from 1,200 to 1,700, including overcrowding to an increased population of 3,200 inmates, and that the Department shall implement said augmented measures.

2.   In consideration of the foregoing, County, District and City agree to support Department's attempt to exclude by legislation the Ione prison from CEQA review and not to file any action to stop construction of the prison other than an action based on breach or nonperformance of any duty set forth herein. Notwithstanding the Legislature's exemption of said prison from CEQA, the Department's CEQA documents shall be incorporated herein by reference for the purpose of interpreting the duties of the Department set forth herein.

3.   The Department's signature hereon shall constitute an irrevocable offer for a period of fifteen (15) days from the date first written above and shall thereupon expire without further action of any party to the County, District, and City to form and enter into the contract set forth herein and County's, District's, and City's acceptance shall be signified by their respective officer's signature.  Said irrevocable offer by Depart-

SAK10/Amador2

ment may be accepted by any one, two, or all three Amador entities and shall thereupon constitute a binding contract as to those entities accepting the offer.

4.    The department's duties set forth herein shall have as a condition precedent thereto the department's affirmative decision to build a prison at the Mule Creek site adjacent to the City of Ione.

5.    The department's location of a sewage treatment plant on five acres of land north or east of the prison as set forth in subparagraph 4.a of the Amended Statement of Findings shall have as a condition precedent thereto either of the following:

(a)   The enactment of AB 2251 exempting the Ione prison from CEQA; or

(b)   The department's preparation of appropriate CEQA documents supporting the amendment of the location of said treatment plant from the location stated in the final EIR and original Statement of Findings to the location specified in subparagraph 4.a of the Amended Statement of Findings, which additional CEQA documents supporting the amending of said location the department promises to prepare and process to completion according to law.

DANIEL J. McCARTHY, Director
Department of Corrections

TIMOTHY R. DAVENPORT, Chairman
Amador County Board of Supervisors

SAK10/Amador2

JUDITH ALLEN, President
Amador County Unified School
District

ROBERT PATTERSON, Mayor
City of Ione

SAK10/Amador2

AMENDED STATEMENT OF FINDINGS

Project Description:

The Department of Corrections proposes to construct and operate a
prison for 1,200 male inmates in Amador County.  After reviewing
the contents of the Final Environmental Impact Report for this
project, the Department and the County agree that the Department's
project and mitigation measures shall be as follows:

     1.    The prison will be a Level III institution in accordance
with SB 95, Chapter 237 of the 1985 Statutes.  The prison will
also house two hundred (200) minimum security level (Level I)
prisoners outside of the Level III secured area.  The minimum
security level (Level I) housing unit shall be surrounded by a
single perimeter security fence.

     2.    The prison will be constructed on the Mule Creek Site,
specifically on the ground to the northwest of Mule Creek itself;
this location will preserve the Lower State-owned Site in farmland,
will preserve the Lower State-owned Site's ability to receive ARSA
effluent, will eliminate the impact upon AmCal Adult Training
Center and nearby neighbors, and preserves the Lower State-owned
Site for potential development, and will preserve the ecological
conditions of the creek-bed area.

     3.    The prison will have the following water transport
treatment and storage system; all of which shall be the subject of
contracts between the Department and the Amador County Water
Agency and the City of Ione, depending upon which entity owns the
pertinent facilities:

     a.    a pipeline capable of carrying a minimum of
1,135,650 gallons per day will be constructed from Tanner Reser-
voir to Ione Reservoir along the existing easement owned by the
Amador County Water Agency.  Approximately 200 feet of pipeline
connecting the Ione Reservoir and the Ione Water Treatment Plant
will be replaced;

     b.    the Ione Water Treatment Plant will be expanded
from 0.85 mgd to 1.99 mgd to supply the prison, the present needs
of the City, and additional homes that may be constructed as a
result of prison staff housing needs;

     c.    a 700,000 gallon water storage tank will be
installed on State-owned property near the existing water storage
tank which serves the Preston School of Industry;

     d.    A pipeline will be installed adjacent to the raw
water pipeline serving the Preston School of Industry from the
Ione Water Treatment Plant to the proposed new water storage tank;

e.   A pipeline will be installed from the proposed water storage tank on PSI property, down Waterman Road, along Highway 104 and to the Mule Creek Prison Site with an interconnection to the City of Ione's water line at Preston Avenue and Sutter Lane.

4.   The prison will have the following sewage treatment and disposal systems:

a.   The Department of Corrections shall construct a new sewage treatment plant capable of treating effluent to secondary and tertiary levels of treatment.  It shall be constructed on-site on 5 acres of land north or east of the prison and shall be capable of treating 0.76 mgd.  Said treatment plant shall accept with connections at pump stations 1 and 2 as designated by the City of Ione, treat, and dispose of all the raw sewage from the California Youth Authority's Preston School of Industry ("PSI"), the prison, and the California Division of Forestry's Fire Academy ("Academy"), and thereafter PSI, the prison, and the Academy shall not require treatment of sewage at the City of Ione's treatment plant, and thereupon any existing contract between the City of Ione and the California Youth Authority for the treatment of sewage from PSI and the Academy shall be terminated or amended by the Department (which has now or promises to obtain authority to so do) and shall be of no further force and effect.  Said prison treatment plant shall be operational, treating the sewage from PSI, the prison, and the Academy, at the time said prison is occupied by one thousand seven hundred (1,700) prisoners or two (2) years from the date of the award of the Department's first construction contract, whichever occurs first.

b.   Disposal of treated effluent will be accomplished using a combination of three methods as necessary to have no significant environmental impacts.  All three methods will include the use of a 47 acre pond to be constructed within one-quarter mile northwest of the prison construction site; this pond will be used for storage of the treated effluent as needed during winter months.  The disposal methods are as follows:

(1)   Treated effluent will be sprayed on up to 300 acres of undeveloped land northeast of the construction site when the weather is warm enough to cause adequate evaporation and permit sufficient evapotranspiration by native plants.

(2)   Treated effluent will be piped underground within the right of way of Highway 104 to privately owned farms up to 7,500 feet west of the prison site, where it will be used to irrigate up to 300 acres of crops during the growing season.

(3)   Effluent treated to a level suitable for creek discharge will be piped underground across State-owned land to Sutter Creek during the rainy season when the creek has a sufficient level of flow and the soil is relatively saturated.

2                                    SAK10/Amador3

c.   The County shall obtain the agreement of the Amador Regional Sanitation Authority ("ARSA"), a joint powers agency formed by and among the City of Sutter Creek, the City of Amador City, and the County of Amador for the disposal of wastewater at Preston Farmlands, to abandon any easements or right currently possessed by ARSA for the disposal of wastewater on the approximately 30-acre site on State property north of State Highway 104; provided, however, that said abandonment shall not apply to any existing wastewater transmission pipeline or canal or easement therefor used by ARSA to transport wastewater from Preston Reservoir to the Preston Farmlands.   In the event that the Department requires the relocation of any said transmission line, canal, or easement, ARSA and the Department shall agree on the new location of each said relocated transmission line, canal, and easement therefor and said relocation shall be carried out at the Department's expense.

5.   Significant adverse impacts and mitigation measures that the Department shall implement are as follows, based upon the Final Environmental Impact Report for the proposed prison in Amador County and in accordance with Section 15091 of the California Administrative Code, Title 14, Division 6.   The following list of potentially significant adverse impacts that could occur as a result of the construction and operation of a 1,200-bed prison in the westerly portion of the City of Ione has been prepared and their respective mitigation measures that will be adopted by the Department are also set forth.

A.   Geology

Impact:  An earthquake could cause surface rupturing, ground-shaking, and ground failure.  The potential for rupturing is small since no faults have been detected on-site and none has been shown to project toward the site.  Groundshaking could cause ground failures, such as landsliding, liquification, ground lurching, and ground settlement.

Mitigation Measures:  To mitigate the effects of very strong seismic groundshaking, the facilities would be constructed in conformance with applicable codes and regulations relating to seismic safety and would incorporate appropriate foundation, grading, and drainage design to mitigate seismic hazards.  A detailed geotechnical investigation of the site will be conducted to determine appropriate construction design.  To mitigate potential secondary effects of groundshaking, the facilities will be placed in appropriate portions of the site.  Since the prison will not be built on the part of the site containing dredger tailings, adverse impacts due to liquifaction will be avoided.

B.   Topography

All the impacts described in the Department's Draft EIR which were associated with the diversion of Mule Creek will not occur because the construction site will be west of the creek, thus eliminating the need to divert Mule Creek underground.

As mentioned in the Draft EIR, the changes in topography that will occur must be discussed in relation to the other findings of the Department can be found in those sections of this document.

Since the creek will not be part of the construction site, riparian wildlife and vegetation will not be affected by the project. Thus, the impacts on wildlife and vegetation in general will be those resulting from construction and placement of the prison rather than the changes in topography in particular.

C.   Hydrology

Impact:  Due to the creation of approximately 30 acres of impermeable surface area, an increase in water runoff of about 0.35 cubic feet per second (cfs) would be expected to occur during a 10-year average storm; 0.46 cfs during a 100-year storm.

Mitigation Measures:  Stilling basins will be constructed if and wherever necessary to reduce the momentum of runoff and provide gradual discharge in order to prevent erosion, creek siltation, and other damage to the environment.

A large portion of the particulate matter that will accumulate on paved areas and would become suspended in storm runoff, will be removed by the use of inmate labor.

If an open drainage channel is used in the final design, native species of vegetation will be planted in the channel to aid in the removal of grease, oil, and other pollutants from the runoff.

Storm water will be removed from the prison compound via a system of overland drainage and storm drains followed by discharge to Mule Creek. Storm water runoff from areas outside the prison compound will be carried overland via a series of swales to Mule Creek.

D.   Housing

Impact:  Approximately 261 prison employees and their families will move to within 40 miles (see pages 28 through 33 of the

Draft EIR) of Ione in order to accept assignments at the new prison.  These families will require housing.

Mitigation Measures:  Since there is ample housing to accommodate the arriving employees, no mitigation measures are required or planned.  However, the choice and supply of housing is increasing due to the residential development that is occurring.  Over 200 dwelling units are proposed in the City of Ione and development proposals in other parts of Amador County are under review.

E.   Schools

Impact:  It is anticipated that as many as 165 children of prison employees may eventually enroll in the Amador County Unified School District.  Whether and when this actually occurs will depend on the rate of new residential development in Amador County; however, considering the current rate of increase in the housing supply, the anticipated enrollment would occur over a span of seven to ten years after the prison is completed.

It is further anticipated that the District will reach or be very near its enrollment capacity by 1986-87 due to growth unrelated to the prison.

Mitigation Measures:  If and when additional educational facilities become necessary, the following methods of financing will be available to the Amador County Unified School District:

1.   Developer (201) fees
2.   Lease-purchase arrangements
3.   Mello-Roos Community Facilities Act
4.   Leroy F. Greene School Building Lease-Purchase Law

(a)   The Department shall accommodate any reasonable request from the District for assistance in applying for funds or classrooms though State programs.  If it becomes evident that relief is not available through the methods listed above or would be subject to significant delay, the Department shall seek legislation that will authorize the Department to provide temporary classroom space.  Upon passage of such legislation, the Department will either purchase or construct the classrooms that would be necessary to accommodate the children of prison employees and loan them to the School District.

(b)   Upon the request of the District the Department shall use its best efforts to obtain from the Department of Finance an adjustment of the anticipated ADA of the District in advance of any actual increase in ADA in order to provide funds for temporary classrooms, personnel, and other costs

relating to increased ADA caused by the prison and/or con-
struction thereof.

(c)  The Department shall support as an amendment to AB
2251 or subsequent legislation if necessary a one-time
appropriation in the amount of ten thousand dollars ($10,000)
to the Department of Finance to be allocated to the District
in order to provide funds for temporary housing and other
expenses resulting from increases in ADA from the location
and/or construction of the prison in the District if delays
in the normal funding processes cause a shortfall in the
District's finances.  The District shall timely seek funding
from all regular funding sources.

F.    Transportation

Impact:  Prison related traffic entering and leaving the
prison at starting and quitting times may result in a hazard-
ous condition on Route 104 at the entrance to the prison.

Mitigation Measure.:  The CDC will comply with the require-
ments of the Department of Transportation which the latter
will specify as condition of approval of an encroachment
permit.  The CDC must be granted an encroachment permit
before it can develop access from the highway.

Impact:  There would be an increase in the traffic which
would pass through the Preston-Main Street intersection in
the City of Ione.

Mitigation Measures:  The additional traffic should not
create significantly adverse problems.  The Department of
Transportation, however, will monitor this intersection for
congestion caused by prison traffic and recommend appropriate
remedial measures when necessary.  Such remedial measures
would be accomplished at State expense.

G.    Courts

Impact:  It is anticipated that inmates of the new prison
will result in an additional 13 prosecution cases on the
Superior * Court caseload annually.  These cases amount to
0.06 of a judge-year standard.  The new free residents of
Amador County that would be attributable to the prison would
add another 0.02 of a judge-year standard.  The increase in
the caseload of the Amador County judicial system will not
warrant capital improvements.  Thus, it will not result in
significant impacts on the physical environment.

Mitigation Measures:  Measures to mitigate impacts on the
physical environment are not necessary.  As stated above, the
prison will affect the caseload of the judicial system of

Amador County. This is regarded as an economic effect and will not have an effect on the physical environment. However, the CDC will aid the County in the mitigation of these economic impacts. At such time that the Amador County Court workload meets the requirements of the Judicial Council for an additional judgeship, the Department will propose legislation that authorizes the additional judgeship and appropriates funds for the judge's salary, support staff, overhead costs, and the construction of a courtroom. In addition, the Department shall plan for a potential County jail site on State property outside of the prison's security fence. Said jail site shall be sized for a County jail of one hundred (100) cells using the Department's design for a one hundred (100) cell block. The Department and the County shall later negotiate in good faith reasonable terms and conditions on which the County may lease or otherwise obtain the right to said site for said purpose.

H.   Water Supply

Impact:  The prison, along with additional housing in the City of Ione, could require up to 1,135,650 gallons of water.

Mitigation Measures:  The Ione water treatment plant will be expanded, pipelines will be run to supply the necessary raw water and to distribute treated water, and a storage tank will be constructed as described in the project description portion of this document.

Impact:  Construction related impacts may occur, such as dust, noise, increased construction traffic, and interference with the normal flow of traffic.

Mitigation Measures:  The construction site will be watered to keep dust down. Construction equipment will operate primarily during normal working hours to prevent adverse impacts due to noise. Construction traffic will occur primarily during normal construction hours and will essentially operate only in the construction area. Construction may occur on an overtime basis at times other than normal working hours to avoid delays in the start-up of prison operation. This would be for short periods.

The installation of pipelines along roadways will be completed as expeditiously as possible and with the utmost regard for the safety and convenience of the public.

I.   Wastewater

Impact:  Potential pollution of groundwater.

Mitigation Measures:  The storage pond will be constructed to prevent pollution of groundwater. Treated wastewater will be

sprayed on grassland or crops at a rate that will depend on the ability of the plants to absorb the moisture and the evaporation rate. Whatever small amount of moisture that is not absorbed by plants or does not evaporate will be filtered and rendered non-toxic by the soil through which it flows prior to reaching the water table. Disposal of treated wastewater will be in accordance with State regulations as found in Title 22, Division 4 of the California Administrative Code.

Impact: Construction related impacts may occur, such as dust, noise, and increased construction traffic.

Mitigation Measures: The construction site will be watered to keep dust down. Construction equipment will operate primarily during normal working hours to prevent adverse impacts due to noise. Construction traffic will be limited to normal construction hours and will essentially operate only in the construction area.

Impact: Odor-causing conditions may occasionally occur.
Mitigation Measures: Odors would occur rarely and would be of short duration. The plant would be constructed far enough away as to have little effect on the two residences on Collings Road. Additionally, aeration of the ponds will be used to reduce odors. Prevailing winds blow away from town and nearby residents.

Impact: There will be changes in land use. The 5 acres required for the wastewater treatment plant, the approximately 300 acres to be used for spray irrigation, and the 47 acres needed for storage ponds are now used for grazing livestock and harvesting firewood. The grazing could continue and would be enhance by increased grass growth. The wood cutting may continue during periods when, and in areas where, spraying of treated wastewater is not occurring. Since the farms that would be irrigated now raise livestock feed, the use of treated effluent from the prison for agricultural irrigation is not expected to change local land use patterns.

Mitigation Measures: The loss of approximately 52 acres of grazing land is not significantly adverse and will be offset by the enhanced production of grass in the areas to be sprayed. The trees suitable for firewood on the pond and treatment plant sites will be harvested.

Impact: Wildlife habitat will be diminished by pond and treatment plant construction. No rare or endangered species will be affected.

Mitigation Measures: The loss of approximately52 acres of common habitat is not considered significantly adverse and will be partially if not entirely offset by the ability of

8                    SAK10/Amador3

the 300 acres of sprayed area to support a slightly higher animal population.  No mitigation measures are proposed.

Impact:  Spray or irrigating with treated effluent could potentially affect the health of the public.

Mitigation Measures:  State health regulations regarding the storage and disposal of treated wastewater will be adhered to.  The storage ponds will be fenced to prevent public contact with the stored wastewater.  The ponds will be situated at least 500 feet from drinking water wells.  The site of sprayed wastewater will be fenced to prevent unauthorized entry and a sufficient buffer zone will be maintained. Spraying will not be allowed to occur within 500 feet of a drinking well.  The irrigation of farm crops will not be permitted within 500 feet of any drinking well.

In conformance with California State Department of Health Services requirements, any wastewater discharged to Sutter Creek would be treated and disinfected to a level safe for body contact.  Discharge would be allowed to occur only when there is sufficient flow in the creek, as prescribed by State requirements.

Impact:  The acres of storage ponds could have an adverse visual impact.

Mitigation Measures:  The storage ponds will be earth bermed impoundments.  These berms will be three feet or more in height above the natural ground elevation.  These berms will be planted in such a manner that they will blend well with the surrounding natural open space setting.  They will be located out of site from public access roads.

J.   Visual Quality

Impact:  The prison complex would be visible to motorists traveling in either direction on Route 104.

Mitigation Measures:  To mitigate potential visual impacts from Route 104, the prison security perimeter would be set back at least 300 feet from Route 104.  The 40 foot elevation (from highway grade) of the construction site will minimize the impacts on visual quality.  The entire prison complex would be designed such that the buildings would be as far as possible from the highway, keeping the visual effects from Route 104 at a minimum.  The prison would also be landscaped with trees.

In particular, wherever not prevented by the terrain or by security considerations, trees would be planted along the highway, outside the 300 foot clear zone.

K.  Archaeological and Historical Resources

Impact:  Pipeline construction has the potential to disturb
and have a significant impact on an archaeological site, a
mound with prehistoric housepits.

Mitigation Measures:  The CDC will try to align the water
pipeline so that it will not disturb the mound with housepits.
Before construction begins, the mound will be marked off or
temporarily fenced.  A professional archaeologist may monitor
pipeline construction near the mound since cultural resources
not evident from the surface evaluation could be unearthed.
If it is impossible to avoid disturbing the mounds during
construction, the Department would have a qualified archae-
ologist excavate the mound to ensure its preservation.

Impact:  Prehistoric artifacts or remains could be uncovered
during excavation.

Mitigation Measures:  A qualified archaeologist will be
consulted for an evaluation prior to removal of the find or
before further disturbance is allowed to occur.  If human
bones are encountered, excavation would stop and the county
coroner would be notified within 48 hours.

6.    The Department agrees to support through AB 2251 or
other legislation if necessary authority for a legislative subven-
tion in the amount of $30,000 for the City of Ione, which subven-
tion the City shall use for the providing of additional police
protection within said City, which protection may be necessary
because of the concentration of construction workers in said City
during the construction of the prison.

7.    The Department agrees to support annexation to the City
of Ione of all the Department's property now owned or hereafter
acquired by the State on which the prison shall be located.

Amendment #1                                                               C87.2042


                    State of California, Department of Corrections (Department);
                                    County of Amador (County);
                        Amador County Unified School District (District);
                                             and
                                    City of Ione (City)

Whereas, Department, County, District and City entered into an agreement dated
September 9, 1985 for mitigation measures relating to the construction of
Department's 1,700 bed prison at the Mule Creek site in Amador County; and

Whereas, page 6, paragraph (c) of the Amended Statement of Findings incorporated
into the original agreement, provided that the Department would support legisla-
tion to authorize payment of $10,000.00 to the District for expenses relating to
increased attendance; and

Whereas, page 10, paragraph 6 of the same Amended Statement of Findings
also provided that the Department would support legislation to authorize payment
of $30,000.00 to the City for additional police protection; and

Whereas, AB 3139 (Chapter 1393, Statutes of 1986) authorized the payment of the
above sums; and

Whereas, AB 2316 (Chapter 578, Statutes of 1987) authorized an additional
$30,000.00 to the City for police protection.

Therefore, it is agreed by and between the parties hereto that, based upon the
foregoing facts, the original agreement is amended as follow:

1.  The agreement is revised to include payment by the Department of $70,000.00
    as follows:

    (a)  $30,000.00 previously paid to the City on or about December 31, 1986.

    (b)  $30,000.00 to be paid to the City upon written request and final execu-
         tion of this amendment.

    (c)  $10,000.00 to be paid to the District upon written request and final
         execution of this amendment.

2.  All other terms and conditions of the original agreement remain in full
    force and effect.

*Pursuant to page 2, paragraph 3 of the original agreement, only those parties affected need execute this amendment.*

State of California
Department of Corrections

County of Amador*

Roger C. Schaufel, Superintendent,
Mule Creek State Prison, Ione

Amador County Unified
School District*

City of Ione*

*Attach Board of Supervisors resolution or minutes authorizing this amendment.*

| AMOUNT ENCUMBERED | PROGRAM/CATEGORY (CODE AND TITLE) | | FUND TITLE | | Department of General Services Use Only |
|---|---|---|---|---|---|
| $70,000.00 | Support | | General | | |
| UNENCUMBERED BALANCE | (OPTIONAL USE) | | | | I hereby certify that all conditions for exemption set forth in Chapter 11 (commencing with Section 7000) of Title 7 of Part 3 of the Penal Code have been complied with and this contract is exempt from the Department of General Services. |
| $ | | | | | |
| ADJ. INCREASING ENCUMBRANCE | ITEM | CHAPTER | STATUTE | FISCAL YEAR | |
| $40,000.00 | 524001001 – (5351) | 135 | 1987 | 87/88 | |
| ADJ. DECREASING ENCUMBRANCE | OBJECT OF EXPENDITURE (CODE AND TITLE) | | | | |
| $ | 404 – (24030) | | | | |
| I hereby certify upon my own personal knowledge that budgeted funds are available for the period and purpose of the expenditure stated above. | | T.B.A. NO. | B.R. NO. | | |
| SIGNATURE OF ACCOUNTING OFFICER | | | DATE | | |
| X  John L. Aulesi | | | 4/21/88 | | By: Donald H. Rey |
| I hereby certify that all conditions for exemption set forth in State Administrative Manual Section 1209 have been complied with and this document is exempt from review by the Department of Finance. | | | | | Date: 4/29/88 |
| SIGNATURE OF OFFICER SIGNING ON BEHALF OF THE AGENCY | | | DATE | | |
| X  Donald H. Rey | | | 4/29/88 | | |

### RESOLUTION NO. 579

#### A RESOLUTION OF THE CITY COUNCIL OF THE CITY OF IONE AUTHORIZING THE EXECUTION OF AN AGREEMENT BETWEEN THE CITY OF IONE AND THE STATE OF CALIFORNIA

*BE IT RESOLVED* by the City Council of the City of Ione that it approves the agreement to release funding of $30,000.00 from the State of California to the City of Ione pursuant to A.B. 3139 and A.B. 2316, and the Mayor of the City of Ione is authorized and directed to execute said agreement on behalf of the said City, and the City Clerk of the City of Ione is authorized to attest the signature of the Mayor upon said agreement.

*THE FOREGOING RESOLUTION* was duly passed and adopted by the City Council of the City of Ione on the 21st day of March, 1988, at a regular adjourned meeting thereof, by the following vote:

| | |
|---|---|
| *AYES:* | Singer, Siciliano, Bowles, Randall, Tillery |
| *NOES:* | None |
| *ABSENT:* | None |

Signed and approved as to form this 21st day of March, 1988.

Margaret Singer, Mayor

*ATTEST:*

Toni Bracken, City Clerk

**BEFORE THE BOARD OF SUPERVISORS OF THE**
**COUNTY OF AMADOR,   STATE OF CALIFORNIA**

IN THE MATTER OF:

RESOLUTION APPROVING AMENDMENT TO THE )
AGREEMENT WITH THE STATE DEPARTMENT ) RESOLUTION NO. 88-127
OF CORRECTIONS, CITY OF IONE, AND THE )
AMADOR COUNTY UNIFIED SCHOOL DISTRICT )
REGARDING MULE CREEK PRISON          )

    BE IT RESOLVED by the Board of Supervisors of the County
of Amador, State of California, that said Board does hereby
approve the amendment to the agreement by and between the
County of Amador, the State Department of Corrections, the City
of Ione, and the Amador County Unified School District, on the
terms and conditions contained therein as it relates to the
Mule Creek Prison.

    BE IT FURTHER RESOLVED that the Chairman of said Board be
and hereby is authorized to sign and execute said amendment on
behalf of the County of Amador.

    The foregoing resolution was duly passed and adopted by
the Board of Supervisors of the County of Amador at a regular
meeting thereof, held on the 5th day of April, 1988, by the
following vote:

    AYES:    Timothy R. Davenport, Gale R. Cuneo, Edward T.
             Bamert, Steve Martin, and John C. Begovich

    NOES:    None

    ABSENT:  None

                            -------------------------------
                            Chairman, Board of Supervisors

ATTEST:

CATHERINE J. GIANNINI,  Clerk of the
Board of Supervisors, Amador County,
California

*Catherine J. Giannini*
-----------------------------------

THE FOREGOING INSTRUMENT IS
A CORRECT COPY OF THE ORIGINAL
ON FILE IN THIS OFFICE.

ATTEST:  APR 5  1988
CATHERINE J. GIANNINI, Clerk of the
Board of Supervisors, Amador County,
California.

*Catherine J. Giannini*

(RESOLUTION NO. 88-127 )                    (04/05/88)